The State of Ohio, Appellee, *v.* Sheppard, Appellant.*

---

*Judgment affirmed, 165 Ohio St., 293. Rehearing denied, July 5, 1956. For other cases in this litigation see: *State, ex rel. Sheppard,* v. *Barber, ante,* 71; *State* v. *Sheppard,* 68 Ohio Law Abs., 581; *State* v. *Sheppard,* 97 Ohio App., 489; *State* v. *Sheppard,* 97 Ohio App., 493; *State* v. *Sheppard, post,* 399; *State* v. *Sheppard,* 164 Ohio St., 428.

Counsel listed at end of opinion.

(No. 23400—Decided July 13, 1955.)

SKEEL, J. This appeal comes to this court on questions of law from a judgment of the Common Pleas Court of Cuyahoga County, entered on a verdict of a jury finding the defendant guilty of murder in the second degree.

The defendant was indicted by the Grand Jury of Cuyahoga County for the crime of murder in the first degree, it being charged that on the 4th day of July, 1954, he purposely and of deliberate and premeditated malice killed Marilyn Reese Sheppard. Marilyn Reese Sheppard, who was the wife of defendant, was found to have been murdered while in bed at her residence at 28924 West Lake Road, Bay Village, Ohio. The

report of her death was first made by the defendant in a telephone call to the mayor of Bay Village, J. Spencer Houk, a close friend of the defendant and the deceased, shortly before 6 a. m., July 4, 1954. Thereafter, the police and firemen of Bay Village, members of the homicide squad of the police department of the city of Cleveland, deputy sheriffs from the sheriff's office of Cuyahoga County and the county coroner and members of his staff, were called to the defendant's home and an examination of the premises was conducted. The defendant was removed to Bay View Hospital, where he was questioned by the coroner, a deputy sheriff and a police officer, and, at some time thereafter he made a written statement of his knowledge of and the circumstances surrounding the death of his wife.

From the first time notice of the death of Marilyn Sheppard came to the attention of the press, radio and television stations, they immediately began to devote a great amount of space in publicizing every conceivable phase of the case. Every step of the way, the announcement of the death of Marilyn Reese Sheppard by force and violence, the investigation of the crime, the inquest, the indictment and every step of the trial was headlined, and on many occasions editorial comment was indulged in.

The trial was protracted over a period from October 18 to December 17, 1954. The jury deliberated on its verdict from December 17 to December 21, 1954, including December 19, which was a Sunday. The jury, consisting of seven men and five women, were quartered in the Carter Hotel in Cleveland, Ohio, under the care of two male bailiffs during their deliberations.

Before the trial began on October 17, 1954, the defendant filed a motion for a change of venue, which motion was renewed from time to time before and during the trial. The defendant also moved to continue the case on the ground that there had been so much publicity that a fair trial could not be had. These motions were overruled and the trial had, resulting in a verdict of not guilty of murder in the first degree, but guilty of murder in the second degree. After the overruling of defendant's motion for new trial, the defendant was sentenced to life imprisonment as provided by law.

The defendant claims the following errors:

"1. The court erred in denying the defendant-appellant's application for bail.

"2. The court erred in denying the defendant-appellant's motion for a change of venue, which motion was repeated from time to time during the progress of the trial and repeatedly overruled.

"3. The court erred in denying defendant-appellant's application for a continuance, which was repeated during the progress of the trial and repeatedly overruled.

"4. The court erred in compelling the defendant-appellant to exercise peremptory challenges when the court should have allowed the challenges for cause.

"5. The court erred in denying defendant-appellant's motions for withdrawal of a juror and continuation of the case.

"6. For irregularities occurring during the trial and which reoccurred from time to time and to which the defendant-appellant objected and which objections were repeatedly overruled.

"7. The court erred in the dismissal from the jury, after the jury was accepted and sworn, of juror William Manning, and substituting in his place, over the objection of the defendant-appellant, juror Jack Hanson.

"8. The court erred in not permitting the defendant-appellant to exercise a peremptory challenge after such substitution.

"9. There was irregularity in the proceedings of the court.

"10. There was irregularity in the proceedings of the jury.

"11. There was irregularity on the part of the prosecuting attorney.

"12. There was irregularity on the part of witnesses for the state of Ohio.

"13. There was error in the orders of the court by which the defendant-appellant was denied the benefit afforded him by the Constitution of Ohio and the Constitution of the United States of America, including the amendments thereto.

"14. There was abuse of discretion by the court, by reason of which the defendant-appellant was prevented from having a fair trial.

"15. There was misconduct on the part of the prosecuting attorney.

"16. There was misconduct on the part of witnesses for the state of Ohio.

"17. The verdict is not sustained by sufficient evidence.

"18. The verdict is contrary to law.

"19. Errors of law occurring at the trial, prejudicial to the defendant-appellant.

"20. Evidence prejudicial to the defendant-appellant was admitted over his objection.

"21. Evidence excluded from the consideration of the jury which was proffered by the defendant-appellant and which should have been admitted in evidence.

"22. There were errors by the court in its charge to the jury which were prejudicial to the defendant-appellant.

"23. There were errors by the court in refusing to give special instructions to the jury prior to argument, as requested by the defendant-appellant, and which were afterwards not included in his general charge.

"24. There was error by the court in overruling the defendant-appellant's motion for a directed verdict of 'not guilty' at the close of the state's evidence in chief.

"25. There was error by the court in overruling the defendant-appellant's motion for a directed verdict of 'not guilty' at the close of all the evidence.

"26. There was error by the court in denying the motions made by the defendant-appellant both at the close of the state's case and at the close of the defendant-appellant's case.

"27. There was error by the court in not removing from the consideration of the jury the count of first degree murder.

"28. There was error by the court in not removing from the consideration of the jury the count of second degree murder.

"29. There was error by the court in not removing from the consideration of the jury the count of manslaughter.

"30. Other errors apparent on the face of the record to the prejudice of the defendant-appellant, and by reason of which he was prevented from having a fair trial, as affirmatively appears from the record.

"31. The indictment by the grand jury was the result of pressure exerted on the grand jury.

"32. The concept of presumption of innocence as established in the law was disregarded by the jury, who in their deliberations substituted for it a presumption of guilt.

"33. That the judge in this case several days before the day of the trial met with newspaper reporters, newspaper photographers, television personnel and radio commentators and arranged the courtroom in such a manner that the representatives of the press, radio and television were given preference to the space in the courtroom. He also caused to be built and erected inside the bar a long table, which extended across the courtroom, and approximately twenty newspaper reporters were assigned seats at this table. One end of the table was within three feet of the jury box. Outside the bar there are four rows of benches which are for the use of the public during trials. Each of these benches will seat about twenty persons. The court assigned the first three rows to the personnel of the press, radio and television and in advance of the trial caused printed slips to be made with the names of such personnel printed thereon, and said printed slips were pasted at regular intervals along said row of benches so that said personnel referred to would know which place was assigned to him or her. The last row was reserved for members of the defendant's family and members of the family of the deceased Marilyn Sheppard. The court established a rule that the admission of other persons to the courtroom was to be by card. The court also assigned to said newspaper, radio and television personnel all the rooms on the courthouse floor, including the assignment room, where cases are assigned to other court rooms for trial. In these rooms said radio, television and newspaper personnel had private telephone lines installed and other necessary equipment to carry on their work. Space in the assignment room was set over for the Chicago Tribune, Chicago Sun, The New York Herald Tribune, the Akron Beacon Journal, The New York Journal American, The Associated Press, The Pittsburgh Post Dispatch, the New York Post, The New York Daily News, The International News Service and the United Press.

"There was also erected in that room special telephone

booths and telegraph equipment which was used to forward with dispatch the reports of the trial.

"Rooms were also assigned to radio commentators on the third floor of the courthouse. This is the floor on which the jury deliberating rooms are located. One such room located next door to the jury that was impanelled in this case, was used by radio station WSRS and broadcasting continued from that room throughout the trial and during the time that the jury was in the room next door and during recess and during the deliberation of the jury.

"During the entire time of the trial a great number of photographers, both television and newspaper, stood on the steps of the courthouse, on the stairs that lead from the ground floor of the courthouse to the second floor and along the corridor on the second floor from the top of the stairs to the entrance of the court room. When the members of the jury came to court, when they arrived for lunch or retired at the end of the trial day, they passed along the way above outlined and were photographed and televised many times, all with the knowledge of the court.

"On a number of occasions, it was necessary for counsel to confer privately with the court in chambers on points that were in issue in the trial. On such occasions when said conferences were held behind the closed door of the judge's chambers, there would be a great rush of photographers, reporters, radio and television personnel into the room which adjoined the judge's chambers. So great was the number that crowded into the room that it was necessary on such occasions for counsel to push their way out so that they could again regain their place in the courtroom. After counsel had secured their exit, then a great number of such persons as described would crowd into the judge's chambers to inquire as to the purpose of the meeting.

"Each morning the defendant-appellant was brought into the courtroom approximately ten minutes before the trial opened, at which time he was surrounded by photographers and television operators and was photographed and televised many times.

"Many times during the trial there was constant moving in the part of the courtroom occupied by said reporters, radio and

television personnel. They kept going in and out and changing places and relieving one another.

"Pictures of the jurors were printed in the newspapers and were shown on television in the evening. Newspaper pictures were taken in the home of one juror by a Cleveland Press photographer and printed in that paper along with an account of how the juror's family fared while the juror was in court. The fact was called to the attention of the court but no action was taken.

"The court permitted photographers to come into the courtroom and take pictures of the jury panel. The court permitted photographers to go into the jury room and take individual pictures of the members of the jury. These pictures were printed in the newspapers.

"Television cameras were set up inside the courthouse with the knowledge and consent of the court. During the trial the court was part of a television program that took place on the steps of the courthouse in the morning at a time when the jurors were arriving. This program was arranged by a reporter named Fabian, a representative of the Scripps-Howard newspapers. The court stood across the street and watched until he received a signal and then walked over to the Courthouse steps, mounted the steps and had a conversation with said Fabian while the television cameras operated.

"On one day while the jury was leaving the courthouse, a man appeared on the courthouse steps carrying a sign referring to the case of Sam H. Sheppard. Counsel for the defendant-appellant took this man and the sign before the Court and requested that he be charged with contempt. Several days later when counsel was not present, this person was released.

"For months prior to the trial, news in the Cleveland newspapers were slanted against the defendant. A front page editorial appeared in the Cleveland Press demanding his arrest and urged he be subjected to the third degree. Day after day the public and jurors were treated to opinion-shaping headlines, such as 'Quit Stalling and Bring Him In'—'Sam Declined July 4th Lie Test'—'Says Dr. Sam Talked Divorce.'—'Testifies Sam Changed Stories'—'Charges Sam Faked Injuries'—'Says Marilyn Called Sam a Jekyll-Hyde.'

"Statements were made by the chief of police, inspector of detectives, head of the homicide squad, members of the prosecuting attorney's office, which were adverse and condemnatory of the defendant. Affiant says that none of said persons testified in the case.

"The defendant in his testimony stated facts bearing upon his questioning by Cleveland detectives. That evening the following headline appeared in the Cleveland News: 'KERR CALLED DR. SAM A BARE FACED LIAR.' The 'Kerr' referred to is Captain David Kerr, head of the Cleveland Homicide Squad. Again, affiant says that said Kerr did not testify in this case.

"The jurors in their *voir dire* examination testified they read Cleveland newspapers and most of them had a Cleveland newspaper delivered into their homes.

"The jurors received the case at 10:30 a. m. Friday, December 17th and deliberated until 4:30 p. m. Tuesday, December 21st. This included deliberation on Sunday, December 19th, from approximately 10:30 a. m. to 6:00 p. m.

"During the deliberations the jury was ordered sequestered and placed in charge of two male officers of the court. During the period of deliberation, the jurors were taken by the officers to their meals and at night were lodged in the Carter Hotel. During the time the jury was allowed to separate and no female officer of the court was appointed to supervise the female members of the jury.

"On one occasion the jury was separated and photographs taken of such separated groups. One photograph was taken of the women members of the jury in one group and another photograph showed the male members of the jury in another group. The photographs of the groups as separated were printed in the newspapers, and in order to arrange such groupings, communications were made with the jury. Other photographs were taken of the jury while at their meals, coming to the courthouse and leaving the courthouse.

"That during the five days of deliberation and during deliberations the jury was in a room that was one flight of about twenty stairs from the courtroom; that the door from the court room to this flight of stairs was generally open; that during the deliberations the court room and the corridor outside was filled

with curious onlookers, reporters, television, radio commentators and photographers. During this time card games were in progress in the courtroom, groups were visiting, a great number of people milled inside and outside of the court room, and the court room and corridors resounded with laughter, loud talk and noises. The floors of the court room and corridor became stained and dirty, and strewn about with papers, cigarette butts, empty paper cups and various litter; that the atmosphere that existed during the trial and during the deliberation of the jury was not conducive to profound and undisturbed deliberations.

"34. The court erred in overruling the request of juror Eleanor Borke to put a question to the defendant-appellant.

"35. The jury consisted of seven men and five women. When the case was submitted to the jury the court appointed two male bailiffs but no female bailiff, and after the commencement of deliberations the jury separated at night and the female members of the jury were not in charge of a female bailiff and were not supervised by an officer of the court; that at the hotel where the jury was quartered, the members of the jury had free access to telephone and did communicate during such time by telephone to various individuals.

"36. The defendant appellant was deprived of his liberty without due process of law and was denied trial by an impartial jury by reason of the widespread publicity and misinformation disseminated through the newspapers, radio and television stations, both before and during the trial; that during the trial the jury was subjected to opinion-forming headlines and editorials, with resultant mass hysteria and the creation of an atmosphere of public opinion which made a fair and impartial trial by jury impossible, all within the knowledge of the court and all contrary to the provisions of the Fifth, Sixth and Fourteenth Amendments to the Constitution of the United States of America and contrary to the provisions of Article I, Section 10 of the Constitution of the State of Ohio.

"37. There was error by the court in overruling the motion by the defendant-appellant for a new trial."

The first claim of error based on the failure of the court to admit the defendant to bail must be overruled. This was a question resting in the exercise of the sound discretion of the

trial court. The evidence produced at the hearing of defendant's request for bail has not been brought into the record before us. In any event, such ruling can not now be raised after trial and conviction.

The second, third, sixth, ninth, tenth, thirtieth, thirty-first, thirty-third and thirty-sixth claims of error are concerned with denying defendant's motion for change of venue and a continuance because of the manner in which the case was publicized. The record shows that the case, from the date of Marilyn Sheppard's death until after the verdict was returned and the motions for new trial were filed and heard, received unusual coverage by the press, radio and television. No case in this community ever attracted such public interest or received so much attention by news disseminating agencies. Some of such publicity unquestionably was intended to spur on the investigation and was highly critical of the defendant and went so far in some instances as to have been designated by other newspapers as an attempt to try the case in the public press before the defendant was indicted. All this is argued by the defendant as establishing that the court committed an abuse of discretion in refusing to continue the case to a later date or to order a change of venue.

The legal questions presented by these assignments of error are not to be decided by a consideration of the publicity and the tendencies it might have in influencing the public mind generally with regard to their judgment of whether the defendant was guilty of the crime charged against him. The legal question is whether or not the defendant would be accorded a fair, constitutional trial by an impartial jury who would decide the issues of fact entirely by considering only the evidence submitted to them in open court, without the slightest outside influence, when considered in the light of the law as given them by the court. The best test as to whether or not a fair and impartial jury can be secured is the examination of jurors summoned as provided by law, on the *voir dire* examination.

In the case of *Townsend* v. *State,* 17 C. C. (N. S.), 380, 25 C. D., 408, the court said, in the first paragraph of the syllabus:

"The examination of jurors on their *voir dire* affords the

best test as to whether or not prejudice exists in the community against the defendant; and where it appears that the opinions as to the guilt of the defendant of those called for examination for jurors are based on newspaper articles, and that the opinions as formed are not fixed but would yield readily to evidence, it is not error to overrule an application for a change of venue." (Affirmed in 88 Ohio St., 584, 106 N. E., 1083, without opinion.)

In the case of *Hawkins* v. *State,* 27 Ohio App., 297, 161 N. E., 284, the indictment was for a violation of the Crabbe Act. The plaintiff in error had attempted to organize the citizens of Lorain County against certain public officials of the county, calling for a special grand jury to investigate the killing of an insane citizen by a public official. While engaged in such activities, the plaintiff in error was indicted under the Crabbe Act, resulting in a great deal of newspaper comment both for and against him by the newspapers and also some members of the public. During the impanelling of the jury, five veniremen were excused for cause after statements that they had fixed opinions regarding the guilt or innocence of the plaintiff in error that would require evidence to remove. The trial court overruled plaintiff in error's motion for change of venue. The court held:

"1. Unless it be shown that a fair and impartial trial cannot be had in the county where an indictment originates, a criminal trial must be tried there.

"2. One accused of crime has right to fair and impartial trial, and, if impartial jury cannot be impanelled in county in which indictment was found, trial court must grant motion for change of venue.

"3. Whether or not an order granting change of venue in criminal case should be made rests largely within the sound discretion of the trial court.

"4. Appellate court should not disturb trial court's ruling on motion for change of venue in criminal case unless it be clearly shown that trial court has abused its discretion.

"5. Denying change of venue for local prejudice of trial for transporting intoxicating liquor in violation of Crabbe Act (Sections 6212-13 to 6212-20, General Code) *held* not abuse of discretion, notwithstanding that affidavits filed in support of

motion alleged that defendant had been criticized and denounced for activities in circulating petitions calling for removal of certain county officials from office and upon occasions of previous arrests on various criminal charges."

In the case of *Richards* v. *State*, 43 Ohio App., 212, 183 N. E., 36, the court held:

"2. That trial court denied change of venue without prejudice until it could be determined whether fair and impartial jury could be impanelled *held* not abuse of discretion. (Section 13427-1, General Code [113 Ohio Laws, 132]; Article I, Section 10, Constitution)."

Other Ohio authorities are: 12 Ohio Jurisprudence, 128, Section 97; 12 Ohio Jurisprudence, 844, Section 853; *State* v. *Stemen,* 90 Ohio App., 309, 106 N. E. (2d), 662; *Dorger* v. *State,* 40 Ohio App., 415, 179 N. E., 143; *Johnson* v. *State,* 6 Ohio Law Abs., 707; *State* v. *Deem,* 154 Ohio St., 576, 97 N. E. (2d), 13.

From the foregoing authorities, the law of Ohio is clear that the best test of whether a defendant can have a constitutional trial in the county in which the indictment is returned is to be determined upon the impanelling of the jury. Citizens summoned for jury service represent a cross-section of the community. Their answers to questions directed to them in the process of impanelling a jury give a clear-cut picture of their state of mind; their answers, indicating whether they will be guided by the evidence alone in reaching conclusions of fact, must be given great weight in considering the question presented by a motion for change of venue. When the great majority of the prospective jurors called or summoned as provided by law to be impanelled in a criminal case state they are not and will not be subject to outside influence if accepted on the jury, a trial judge who overrules a motion for change of venue under such circumstances is not guilty of an abuse of discretion. The very foundation of the jury system is founded upon the inherent honesty of our citizens in performing courageously such public service without fear or favor.

The law of Ohio on this subject is in complete accord with the great weight of authority as shown by the opinions of a great majority of the courts of last resort.

In the case of *Viereck* v. *United States,* 130 F. (2d), 945,

which was a prosecution for violation of the ''Propaganda Agency Act'' where a change of venue was asked because widespread newspaper stories had aroused the community against the defendant, the court held that the overruling of such motion did not constitute an abuse of discretion where the record revealed that the jury was chosen very carefully and both sides accepted the jury which was eventually sworn.

In the case of *People v. Broady*, 195 Misc., 349, 90 N. Y. Supp. (2d), 864, which was a wire-tapping prosecution, the court held that newspaper comment alone, even though extensive, does not establish that a defendant can not be afforded a fair trial in the county where the indictment was returned and the overruling of a request for a change of venue did not constitute prejudicial error.

Likewise, in the case of *People v. Sandgren*, 190 Misc., 810, 75 N. Y. Supp. (2d), 753, the defendant was charged with second-degree manslaughter resulting from the killing of an eleven year old boy by defendant's dogs wherein it was charged that defendant permitted such dogs to run at large notwithstanding their dangerous propensities of which defendant had full knowledge. In this case there was extensive newspaper coverage including direct declarations of defendant's guilt and that he knowingly kept savage, vicious, killer dogs. The court, in overruling a motion for change of venue, held that widespread publication of belief or opinion by the press, of defendant's guilt, does not show serious doubt whether defendant will receive a fair trial so as to warrant change of venue since the press is entitled to publish news with fair comment.

See also: *People v. Connors*, 251 Mich., 99, 230 N. W., 931; *People v. Swift*, 172 Mich., 473, 138 N. W., 662; *People v. Broady, supra*; *State v. Burns*, 79 R. I., 130, 84 A. (2d), 801: *State v. Cooper*, 10 N. J., 532, 92 A. (2d), 786; *Jones v. State*, 156 Tex Cr. R., 248, 240 S. W. (2d), 771; *People v. Walker*, 112 Cal. App. (2d), 462, 246 P. (2d), 1009; *Winingar v. State*, 97 Okla. Cr. Rep., 64, 257 P. (2d), 526; *Wetzel v. State* (Miss.), 76 So. (2d), 188; *State v. Loveless* (W. Va.), 80 S. E. (2d), 442; *Terrance v. Commonwealth* (Ky.), 265 S. W. (2d), 40; *State v.*

*Williams,* 245 Iowa, 494, 62 N. W. (2d), 742; *State* v. *Godwin,* 216 N. C., 49, 3 S. E. (2d), 347.

In the case of *State* v. *Bird,* 31 Wash. (2d), 777, 198 P. (2d), 978, the Supreme Court affirmed the overruling of a motion for change of venue in a homicide case where there had been many newspaper accounts, the crime being one of great brutality, and held that a denial of such motion based on claimed local prejudice was not error in the absence of a showing that a situation had been created which would prevent defendant from receiving a fair trial before an impartial jury. It was likewise held in the case of *Terrance* v. *Commonwealth, supra,* that a defendant in a homicide case was not prejudiced by the denial of a motion for change of venue and it was not an abuse of discretion to overrule such motion despite newspaper and radio publicity in a county of approximately 500,000 people, where there was a large reservoir of qualified jurors. Also, the Supreme Court of Georgia, in the case of *Morgan* v. *State,* 211 Ga., 172, 84 S. E. (2d), 365, in which defendant had been charged with murder, it was shown that newspapers had carried news items and editorial comment to the effect that defendant had confessed the crime for which he had been indicted and also articles had been published about the defendant of an inflammatory nature. It was held that such facts were not sufficient in themselves to establish that a fair and impartial trial could not be had in the county in which such newspapers were published in the absence of further allegations and proof that jurors who had been summoned to try the case had read the articles and publicity and had formed fixed opinions as to the guilt or innocence from such newspaper articles.

As shown by the foregoing authorities, a refusal to continue a case because of adverse publicity is to be decided by the same rules as are applicable in considering a motion for change of venue. *Snook* v. *State,* 34 Ohio App., 60, 170 N. E., 444. Annotation to *Delaney* v. *United States* [199 F. (2d), 107], in 39 A. L. R. (2d), 1300, 1314, paragraph 4, page 1321.

The record in this case discloses that a special venire was called for the trial of this defendant as provided by Section 2945.18, Revised Code. Seventy-five names were drawn from

the jury box. Of this number eleven were immediately excused for justifiable reasons, or were not found and could not be summoned (three in number) by the sheriff. Of the remaining sixty-four, thirteen were excused because they had formed a firm opinion as to the guilt or innocence of the accused and ten were likewise excused because they were opposed to capital punishment. Sixteen others were excused for cause.

The state used four peremptory challenges and the defendant five. As is provided by Section 2945.21, Revised Code, the state in a homicide case where there is but one defendant is entitled to six such peremptory challenges and the defendant a like number, so that when the jury was sworn the defendant left the right to one peremptory challenge unused. From the foregoing analysis of the venire of 75 electors called in this case, four of those called were not needed in empanelling a jury of twelve. Such jury was selected as provided by law and sworn and accepted by the defendant to well and truly try, and true deliverance make between the state and the defendant.

The parties agreed to select two alternate jurors as provided by Section 2313.37, Revised Code. The four remaining jurors of the original list, together with an additional venire of 24 summoned as provided by law, were used for this purpose. Of the 24 summoned, eight were called and questioned together with the four from the original venire in impanelling the two alternate jurors. Of those examined, three were excused for holding a firm opinion of the guilt or innocence of the accused, four were excused as being against capital punishment, one was excused on challenge for cause, and each side used one peremptory challenge. (Each side had the right to excuse two prospective alternate jurors peremptorily under the provisions of Section 2313.37, Revised Code.)

The analysis of the empanelling of the jury in this case where but 16 prospective jurors out of 72 examined could not sit because they had prejudged the guilt or innocence of the accused, clearly shows that there was no difficulty whatever in impanelling a fair and impartial jury.

The jury having been impanelled as provided by law and sworn to afford the defendant a fair and impartial trial and to come to its verdict by a consideration of the evidence submit

ted in open court without any outside influence or consideration, and where there is no claim of misconduct on the part of any member of such jury during the trial, there can be no ground to claim a mistrial because of continued publicity, publicizing the events of the trial, and other related matters.

Claims of error Nos. 2, 3, 6, 9, 10, 13, 14, 31, 33 and 36 are, therefore, overruled.

The defendant has grouped assignments of error numbers 4, 5, 6, 7, 8, 9 and 14 under the general topic of "Errors in impanelling the Jury."

The first complaint of the defendant has to do with the court sustaining objections of the state to questions propounded to a prospective juror (Verlinger) concerning what effect the defendant's affairs with other women would have on him, that is, "would that prejudice you against him, or create in you a sense of ill-will toward him so that you would disregard the proof necessary to convict him of first degree murder?" The evident purpose of this question was to find out what effect evidence of extra-marital activities of the defendant, if shown, would have on the juror's consideration of other evidence. In the form in which the question was asked, it was objectionable in that it asked the juror what his conclusions would be upon considering such testimony. The question as framed was very difficult to understand. The meaning ascribed to the question by the defendant in argument would have been proper. After the objection was sustained the defendant reframed the question and the court, over the objection of the state, allowed it to be answered. We do not find that the defendant was prejudiced by the court's sustaining the state's objection when considered in the light of the complete examination of all of the jurors by both the state and the defendant on the subject. The question in a modified form was asked of all but three of the jurors (who were sworn and served in the case) and answered without objection. The cases cited by defendant are not directly in point. They deal with the question of prejudice against a defendant himself because of race or other associations or conduct.

As to the juror Borke a question much like the one propounded to juror Verlinger, above considered, was asked, and the state's objection thereto sustained. It does not appear that

defendant reframed the question and the subject was not pursued further. As to the jurors who were excused peremptorily by the defendant, three were permitted to answer a question on the subject of the same tenor as was answered by the nine jurors selected to try the case, as to prejudice because of marital infidelity of defendant, and two were not interrogated on the subject.

After the jury was sworn and the agreement to empanel the two alternate jurors was had, it came to the attention of the court upon information received from an outside source, that juror Manning had not told the truth in answer to a question as to whether or not he had been a witness in a criminal case. The juror's answer had been "No." The information that then came to the court and parties was that this juror had been arrested on a morals charge and, upon conviction, had been sentenced to the workhouse, the sentence being suspended. This took place in 1943.

The court, after knowledge that the state was going to object to juror Manning although then sworn as a juror, proceeded to empanel the alternate jurors. After the alternate jurors were sworn, juror Manning was then asked if he had testified in the 1943 incident, to which he answered, "I believe I did, sir I don't know, yes, I did." He also stated he had gotten into an emotional state of mind by having this past experience given such publicity. He stated that since the happening of such event he had lived an honorable life and was the father of a family. The defendant entered an objection to juror Manning being dismissed from the jury. After the alternate jurors were sworn, juror Manning stated, in part, in open court:

"I tried to be absolutely unbiased and unprejudiced in talking to other people, even in speaking outside the jury. But after what has happened, I would not be able to sit in the box with the other jurors, be able to sit in this case and be unbiased unprejudiced or unemotional is what I am trying to drive a mostly. If this keeps up, if I am kept on the jury, I think will be a sub-headlines as long as the trial goes on. I will definitely have a nervous breakdown in a very short time and, i fact, I feel I am just about ready for one right now."

The court excused juror Manning in the exercise of it

sound discretion, under the authority of Section 2945.29, Revised Code, which provides:

"If, before the conclusion of the trial, a juror becomes sick, or for other reason is unable to perform his duty, the court may order him to be discharged. In that case, if alternate jurors have been selected, one of them shall be designated to take the place of the juror so discharged. * * *"

The defendant entered his exception to the procedure used by the court in discharging juror Manning and demanded the right to exercise his remaining peremptory challenge when the first alternate juror was seated in the panel after Manning was discharged, which request was refused.

After a jury is sworn and charged with the delivery of the defendant, the trial is commenced, and unused peremptory challenges can not thereafter be used; and, where an alternate juror has been selected and sworn as provided by law, he must be seated in the place of the discharged juror by order of the court.

One other error is claimed in the impanelling of the jury. The court granted the state's challenge for cause as to juror Richter who was called to be impanelled as the second alternate juror. The evidence shows that this prospective juror had met both the defendant and his wife and had played golf with Mrs. Sheppard. Under oath, however, she stated that her "acquaintance with them was so slight that I don't think—I know it would not interfere with my opinion." After she again answered "yes" to the question of whether she could be a fair and impartial juror in the case, keeping in mind that she had known both the defendant and deceased, the court granted the state's motion challenging her for cause. Section 2945.25, Revised Code, does not include acquaintance as a ground of a challenge for cause and when a prospective juror under oath states that such acquaintance will in no way prejudice her and that she can act fairly and impartially as a juror, it constitutes error to grant a motion to discharge such juror for cause. Such error, however, was not prejudicial to the rights of defendant for two reasons. First, the second alternate juror empanelled after Richter was dismissed, did not become a member of the panel that was finally charged with the deliverance of the defendant

at the conclusion of the trial. At the conclusion of the trial the second alternate juror was dismissed and took no part in deliberating upon the verdict. And second, the state did not use up its peremptory challenges in empanelling the alternate jurors and it is therefore quite probable that it would have excused juror Richter peremptorily had the motion to dismiss her for cause been overruled.

Assignments of error Nos. 4, 5, 6, 7, 8, 9 and 14 are, therefore, overruled.

Assignments of error Nos. 17, 18, 24, 25, 26, 27, 28 and 29 are treated together in defendant's brief under the heading: "The court erred in denying the motions for directed verdict or for dismissal of the indictment." This heading is divided into three sections:

"1. The state has the burden of proof to establish defendant's guilt beyond a reasonable doubt.

"2. In the absence of substantial evidence on all the elements of the crime charged against the defendant, it is the duty of the court to direct a verdict.

"3. That there is no substantial evidence of defendant's guilt but [the evidence] rather supports defendant's story and is inconsistent with his guilt."

The elements of the crime of murder in the first degree as here charged against defendant and as defined by Section 2901.01, Revised Code, are that defendant purposely killed Marilyn Sheppard of deliberate and premeditated malice. There is no question that the venue of the crime charged is in Cuyahoga County, Ohio. Likewise, the death of Marilyn Sheppard is not in question. That she was the victim of a brutal murder is not in dispute. The defendant in his brief on page 267 says:

"It is true that an intent by *someone* to kill the decedent and that there was malice on the part of whoever did the killing may be inferred from the nature of the wounds and from the brutal and vicious attack that was made."

And on page 12 of his brief defendant says:

"Marilyn Reese Sheppard, aged 30 years, was murdered in the bedroom of her home some time between midnight and 5:30 a. m. on Sunday July 4th, 1954."

The murder is described in the closing arguments of the state "as one of the most brutal and vicious murders in the history of crime." The evidence of the pathologist of the coroner's office, and county coroner, giving opinion evidence of the cause of death, supported by pictures, portrays in all its horrible detail the scene in Marilyn Sheppard's bedroom on the morning of July 4, 1954. The evidence of Marilyn Sheppard's lying in a blood-soaked bed with 35 separate wounds, evidently resulting from blows of a blunt instrument, about her head and hands, in some instances of sufficient force to cause fractures of the skull, is unquestionably sufficient for the jury to find that the person who inflicted such wounds upon the person of the deceased, acted with a purpose to kill. The only questions left for consideration of the jury, which fact must be shown beyond reasonable doubt, that the defendant was the person who committed the acts causing the death, and if established by that degree of proof then to determine the degree of murder as defined by the statutes.

We go, therefore, directly to an examination of the evidence dealing with this question. It must be remembered that on appeal the court does not retry the issues of fact but is concerned only with whether there is sufficient and ample evidence to require a submission of the case to the jury, and, where a verdict has been returned, whether there is substantial evidence (without weighing such evidence) to justify the verdict.

It is the claim of the state that the defendant, and the defendant alone, caused the death of his wife. It is the contention of the defendant that a third person was, or third persons were in defendant's house on the morning of July 4th, and were responsible for her death. This, of course, is not by way of establishing a defense, because the defendant has no such burden. It is enough if, when weighing such evidence when fairly considered with all the other evidence in the case, the jury does not find the existence of the essential facts necessary to establish the defendant guilty beyond a reasonable doubt. It is the contention of the state that only three people were in the Sheppard house after midnight of the beginning of July 4th, that is, the 7 year old son of the parties, the decedent, and the defendant, and that all the circumstances as shown by the evidence

point directly to defendant as the one who perpetrated the crime. Also, the claim of defendant's account of his encounters with the supposed intruder or intruders and his descriptions of him or them is so unbelievable as to give weight to the state's circumstantial case. On direct examination in his own defense the defendant testified in part as follows:

"A. The first thing that I can recall was hearing Marilyn cry out my name once or twice, which was followed by moans, loud moans and noises of some sort. I was awakened by her cries and in my drowsy recollection, stimulated to go to Marilyn, which I did as soon as I could navigate.

"Q. Now, just one question here. Did you have a thought in your mind at that time as to what caused Marilyn to cry out? A. My subconscious feeling was that Marilyn was experiencing one of the convulsions that she had experienced earlier in her pregnancy and I ascended the stairway. As I went upstairs and into the room I felt that I could visualize a form of some type with a *light top*. As I tried to go to Marilyn I was intercepted or grappled. As I tried to shake loose or strike, I felt that I was struck from behind and my recollection was cut off. The next thing I remember was coming to a very vague sensation in a sitting position right next to Marilyn's bed, facing the hallway, facing south. I recall vaguely recognizing my wallet.

"Q. Now, just a moment. At that point have you any way or can you determine—is there any way of determining the length of time between the time you were knocked out and when you came to this sitting position? A. No, sir, no way that I know of.

"Q. Now, I am handing you state's exhibit 27 and defendant's exhibit T. Is that your wallet? A. Yes, sir, it is.

"Q. When was the last time you had it in your hand before I handed it to you this morning? A. It must have been that morning.

"Q. That morning. Now, you say—what? A. I may have had it in my hand at the inquest. I'm not sure whether Doctor Danaceau handed it to me or just held it.

"Q. I see, but—A. Mr. Danaceau—excuse me.
"* * *

"Q. Now, I have come to the point where you had awakened

and saw the faint glow of your badge on the floor. Do you remember? A. Yes, sir.

"Q. Was there a light in the house anywhere? A. Yes, sir, there was.

"Q. That you remember? A. There was a light.

"Q. And where was that light? A. I cannot say for sure, of my own knowledge.

"Q. There was some kind of light? A. Yes, sir.

"Q. Now, then, after you awakened or came to consciousness repeat, as best as you can, in your own words, to this jury what you saw and what you did. A. Well, I realized that I had been hurt and as I came to some sort of consciousness, I looked at my wife.

"Q. What did you see? A. She was in very bad condition. She had been—she had been badly beaten. I felt that she was gone. And I was immediately fearful for Chip. I went into Chip's room and in some way evaluated that he was all right. I don't know how I did it. I, at this time or shortly thereafter, heard a noise downstairs.

"Q. And what did you do when you heard the noise downstairs? A. And I—I can't explain my emotion, but I was stimulated to chase or get whoever or whatever was responsible for what had happened. I went down the stairs, went into the living room, over toward the east portion of the living room and visualized a form.

"Q. Now, where was that form when you first visualized him? A. Between the front door of the house and the yard somewhere.

"Q. Now, are you able to tell the jury what your mental condition was when you came out of this—awoke from this attack? A. I was very confused. It might be called punchy, in language that we use as slang. I was stimulated or driven to try to chase this person, which I did. My—

"Q. And when you saw the form, what did you do? A. Well, I tried to pursue it as well as I could under the circumstances.

"Q. And where did you pursue it? A. Toward the steps to the beach at which time I lost visualization of this form.

"Q. Was it dark? A. Beg pardon?

"Q. Was it dark? Dark? A. Yes, sir, it was dark but there was enough light from somewhere that I could see this form.

"Q. Yes, all right. A. I descended the stairway and to the landing and I visualized the form going down, or as he came on the beach. And it was at this time that I felt that I could visualize a silhouette that was describable. I—

"Q. What happened on the beach? A. I descended as rapidly as I could. I lunged or lurched and grasped this individual from behind. Whether I caught up with him or whether he awaited me, I can't say. I felt as though I had grasped an immovable object of some type. I was conscious thereafter of only a choking or twisting type of sensation, and that is all that I can remember until I came to some sort of very vague sensation in the water, the water's edge.

"Q. Were you able to determine anything about that person? A. Yes, sir.

"Q. And what? A. Well, I felt that it was a large, relatively large form; the clothing was dark from behind; there was evidence of a good sized head with a bushy appearance at the top of the head—hair.

"Q. Now, then, when you came to the second time, just where were you? A. I don't know exactly where I was. I was—

"Q. Were you on the beach? A. I was on the beach with—

"Q. Where was your head and where were your feet? A. My feet were in the water and my head was directed to the sea wall, toward the south, generally. I could have been slightly askew. The waves were breaking over me and even moving my lower part of my body some.

"Q. What was the condition of light at that time? A. Light?

"Q. Light, yes. A. It was light enough to see at that time I could see Huntington Pier later when I came to enough sensation to see at all.

"Q. Day was breaking, is that right? A. I would say it had broken somewhat.

"Q. Day had broken. What was your mental and physical condition as you remember it now, that you were in at the time that you came to consciousness on the beach? A. My mental condition was that I was extremely confused. I didn't know where I was or how long I had been there, or my own name, for that matter.

"Q. Do you know how long you lied on the beach before you got up? A. No, sir, I don't.

"Q. Well, you did get up to your feet? A. I finally did.

"Q. Do you know how you got up the steps? Do you have any recollection of that? A. I remember, as I finally came to enough sensation to get to my feet, I rather staggered up the stairway and as I was going up, or as I was recognizing that this was my house, I entered the house and came to the realization that I had been hurt and that I had been struck by an intruder and I was then fearful for Marilyn although I can't say that I actually remembered of seeing her.

"Q. You remember what? A. I can't say that at that time I remembered seeing her the previous time upstairs.

"Q. How was your mind working? Was there any blocking of your mental processes at that time? A. The best I can explain it is that my mind was working like a nightmare or a dream, very horrible dream.

"Q. And then what did you do when you got in the house? A. I eventually went up the stairs. I'm not sure just exactly how rapidly I went upstairs but I did finally go upstairs and it was at that time that I re-examined Marilyn.

"Q. Was there enough light in her room then to see her? A. Yes, sir.

"Q. What did you see? A. I saw that she had been terribly beaten.

"Q. Did you determine she was dead? A. Yes, I thought that I did.

"Q. What was your feeling at that particular time, if you had any feeling, that you remember? A. I was horrified. I was shaken beyond explanation, and I felt that maybe I'd wake up, maybe this was all a terrible nightmare or dream and I walked around, paced, I may have rechecked little Chip. Very likely I did, but I can't say specifically that I did, and I may have gone back in to see Marilyn. As I recall—I could have passed out again, I don't remember but I was staggered. Finally I went down the stairs trying to come to some decision, something to do, where to turn. I must have paced and walked around downstairs trying to shake this thing off or come to a decision and I thought of a number and called it.

"Q. What was the number you thought of? A. I thought that the number was that of Mr. Houk's.

"Q. Do you recall what you said to him over the phone? A. No, I don't.

"Q. Where was the telephone? A. There are two phones downstairs. I'm not positive which one I used.

"Q. And do you know how long it was, have you any recollection of the length of time between your telephone call and the appearance of Mr. and Mrs. Houk? A. It seemed like a long time, but it evidently was a relatively short time.

"Q. And do you know where you were or what you were doing between the time that you made the telephone call and the arrival of Mr. and Mrs. Houk? A. I was walking through the house again and trying to—trying to clear my mind, trying to remember what had happened, trying to remember a description of this individual that I had seen, trying to differentiate whether there were two people or one, in fact, almost thinking there were two. I, shortly before the Houks came, stopped in the kitchen and put my head on the table and that is the first time I recall realizing or recognizing that I had a very severe pain in the neck. Up to that time I may have been holding my neck but I don't remember. And at that time I felt that my neck was injured."

On July 4, at 11 a. m., the defendant made the following statement to officer Schottke of the Cleveland police department as shown by the police report created July 7, 1954, which was received into evidence as "State's Exhibit 49":

"Sir:

"The following is the list of questions asked Dr. Sam Sheppard on the first time we questioned him on July 4, 1954:

"Q. Will you tell us everything that you know about this? A. He stated that the Aherns were visiting and that he fell asleep on the couch before they left. The thing he remembers is that he heard his wife screaming and he ran up the stairs and as he entered the room he thought he seen a form and at that time he heard someone working over his wife. He then was attacked and hit on the side of the head and knocked unconscious. When he regained conscious he heard a noise downstairs and he ran downstairs and seen a form going out the door leading

to the porch. He ran after this form and chased him down the stairs and when he got to the boathouse landing he doesn't remember if he jumped over the railing or if he ran down to the beach but he half tackled him and he struggled with him and was again knocked unconscious. When he regained consciousness, he was on his stomach on the beach being wallowed back and forth by the waves. He then went up to the house and wandered around in a daze and went up and went up to his wife's room and attempted to administer to her and felt that she was gone. He then went downstairs and wandered around in a daze and finally a telephone number came to his mind and he called this number and it was Mayor Houk. He said that Houk came to his house and also his brother Richard and he was then taken to the hospital.

"Q. Asked him to describe the screams. A. Stated that they were loud screams.

"Q. How long did the screams last? A. Stated all the while he was running up the stairs.

"Q. Asked him if the same person attacked him that he heard working over his wife. A. Stated no, as he was under the impression that he was attacked by someone else at the time he heard someone working over his wife.

"Q. Asked him how many times he was assaulted? A. Stated two or three times at the most.

"Q. With what were you assaulted? A. He stated with fists.

"Q. Asked him if he could describe the person that went out the door, if that person was white or colored? A. He stated the person must have been white because the dog always barks at colored people. This person was taller than he was, he was about 6'3" and was dressed in dark clothing and was a dark complected white man.

"Q. Asked him if he turned on any light at the time he looked at his wife in the bedroom. A. He stated no.

"Q. Asked him if there were any lights on in the house. A. He stated he does not remember, he does not recall.

"Q. Asked him how he could see to administer to his wife if he did not turn on any lights. A. He stated he was able to determine there was nothing he could do for her and that she was gone.

"Q. Asked him as to the condition as to light and darkness at the time he regained consciousness on the beach. A. He stated it was a little lighter than dark.

"Q. Asked him if the doors were kept locked in the house. A. He stated the doors were never locked.

"Q. Asked him if there was a great deal of money kept around the house. A. Stated no, only about $60 or $70.

"Q. Asked if any narcotics were kept in the house. A. Stated no, but there may be a few samples in my desk.

"Q. Asked him about Dr. Hoversten staying at his house and where he was at now. A. He stated Dr. Hoversten was staying at his house for a few days but that he had left yesterday afternoon to keep a golf date at Kent, Ohio.

"Q. Asked him if he had heard rumors to the effect that Dr. Hoversten was infatuated with his wife. A. He stated that he had heard those rumors but he did not think anything about it and the rumors might be true.

"Q. Asked him if he knew of any men that may have stopped at his home while he was at work. A. He stated that several men have stopped but that his wife was faithful to him

"Q. Asked him if he could name any of them. A. Stated that he could not think of any names right now.

"Q. Asked him if he was running around with any women A. He stated no.

"Q. Asked him if his wife was running around with any men. A. Stated no."

Defendant talked with Coroner Gerber at the hospital a about 9 a. m. on July 4th. Dr. Gerber testified as to defend ant's statement of the events of the morning of July 4th, a follows:

"Q. Did you have a conversation with him? A. Yes, sir.

"Q. Now will you please relate the conversation? A. asked him if he could tell me what happened, that is, I aske Dr. Sam Sheppard if he could tell me what happened. He sai he would try to and his conversation was as follows:

"That he was sleeping on this couch or davenport and tha he thought he heard someone call him, 'Sam.' That he imm diately jumped off the couch and rushed upstairs. When he g to the head of the stairs something clobbered him on the ba

of the neck or head, and that he was rendered unconscious. He doesn't know how long, he stated, he didn't know how long he was unconscious but when he came to he thought he heard a noise in the living room. That he rushed back down the stairs to the living room and that he was—he thought that he saw some form going out of the doors toward the stairs that lead to the beach. That he rushed after the form, and that when he got to the foot of the stairs that lead actually to the beach alongside of the boathouse or bath house, he got into a wrestling match or hassle with the form and that he was rendered unconscious again, and he woke up later and went back up to the house and then went into—up the stairs—went into the living room, up the stairs to the second floor and into his wife's bedroom and felt of her pulse at the neck; realized that there was something wrong with her, something seriously wrong with her, that she was probably dead. That he came back downstairs and some time later called Mayor Houk. I asked him if he could see this form as he went up the stairs from the couch. He said, 'No, it was too dark to see.' He couldn't see anything except a form.

"I asked him if he could see the form going down the stairs to the beach. He said, 'No, just a form. Just an outline.' I told him I wouldn't ask him any more questions and left. At the time that I was—he was talking to me and I was asking these questions, Dr. Richard Sheppard came in and another doctor of the hospital came in and took—this doctor, other doctor, took Dr. Sam Sheppard's blood pressure."

He also stated:

"That he rushed after this form. He couldn't tell definitely what this form was, couldn't tell whether it was a human being or whether it was a man or a woman, whether or not it had a hat on, whether or not he could see any hair, whether or not it had a coat or trousers on."

The foregoing was repeated at the inquest at Normandy School as shown on page 3101 of the record.

On the afternoon of July 4th at about 3 p. m., the defendant was again questioned by Officer Schottke at which time he stated in part, as testified to by Officer Schottke:

"We then told him that there was blood on the band and

on the crystal of the wrist watch, asked him if he could tell us how the blood got there. He stated that he remembered that at the time that he regained consciousness in the upstairs bedroom that he had felt his wife's pulse at the neck and felt that she was gone and at that time he must have gotten the blood on the wrist watch and then he heard a noise downstairs and ran downstairs.''

On July 10th defendant went to the sheriff's office at the request of the authorities, where a full written statement was made which was in part as follows (State's exhibit 48):

''* * * I evidently became very drowsy and fell asleep. I recall wearing summer cord trousers, a white T shirt, mocassin type loafers with no shoestrings, I am not sure of the socks. I don't know whether I had removed my brown corduroy coat that I had put on earlier, or whether I did at this time or not. The next thing that I recall very hazily, my wife partially awoke me in some manner and I think she notified me that she was going to bed. I evidently continued to sleep. The next thing I recall was hearing her cry out or scream. At this time I was on the couch. I think that she cried or screamed my name once or twice, during which time I ran upstairs, thinking that she might be having a reaction similar to convulsions that she had had in the early days of her pregnancy. I charged into our room and saw a form with a light garment I believe. At the same time grappling with something or someone. During this short period I could hear loud moans or groaning sounds and noises. I was struck down. It seems like I was hit from behind somehow and had grappled this individual from in front or generally in front of me. I was apparently knocked out. The next think I knew I was gathering my senses while coming to a sitting position next to the bed, my feet toward the hallway. In the dim light I began to come to my senses and recognized a slight reflection on a badge that I have on my wallet. I picked up the wallet and while putting it in my pocket came to the realization that I had been struck and something was wrong. I looked at my wife. I believe I took her pulse and felt that she was gone. I believe that I thereafter instinctively or subconsciously ran into my youngster's room next door and somehow determined that he was all right. I am not sure how I de

termined this. After that, I thought I heard a noise downstairs, seemingly in the front eastern portion of the house. I went downstairs as rapidly as I could coming down the west division of the steps. I rounded the L of the living room and went toward the dining table situated on the east wall of the long front room on the lake side. I then saw a form progressing rapidly somewhere between the front door toward the lake and the screen door, or possibly slightly beyond the screen door. I pursued this form through the front door, over the porch and out the screen door and then on down the steps to the beach, where I lunged or jumped or grasped him in some manner from the back, either body or leg, it was something solid. However, I am not sure. This was beyond the steps an unknown distance but probably about ten feet. I had the feeling of twisting or choking and this terminated my consciousness.

"The next thing I know I came to a very groggy recollection of being at the water's edge on my face, being wallowed back and forth by the waves. My head was toward the bank, my legs and feet were toward the water. I staggered to my feet and came slowly to some sort of sense. I don't know how long it took, but I staggered up the stairs toward the house and at some time came to the realization that something was wrong and that my wife had been injured. I went back upstairs and looked at my wife and felt her and checked her pulse on her neck and determined or thought that she was gone. I became or thought that I was disoriented and the victim of a bizarre dream and I believed I paced in and out of the room and possibly into one of the other rooms. I may have re-examined her, finally realizing that this was true. I went downstairs. I believe I went through the kitchen into my study, searching for a name, a number or what to do. A number came to me and I called, believing that this number was Mr. Houk's. I don't remember what I said to Mr. Houk. He and his wife arrived here shortly thereafter. During this period I paced back and forth somewhere in the house, relatively disoriented, not knowing what to do or where to turn. I think that I was seated at the kitchen table with my head on the table when they arrived but may have gone into the den. I went into the den as I recall,

either before or shortly after they arrived. The injury to my neck is the only severe pain that I can recall. I should say, the discomfort to my neck. I didn't touch the back door on the road side to my recollection. Shortly after the Houks arrived, one of them poured a half glass of whiskey as they knew where we kept a small supply of liquor, and told me to drink it. I refused, since I was so groggy anyway. I was trying to recover my senses.''

The defendant's statement of the facts as above set forth is to be found with some discrepancies, variations or omissions, in the testimony of other witnesses when called to tell what the defendant told them when questioned on the subject. The first declarations of the defendant were made to Mayor Houk who arrived at the Sheppard home shortly before 6:00 a. m. on July 4th in response to the defendant's call. The mayor testified the defendant said:

''My God, Spence, get over here quick, I think they have killed Marilyn.''

He testified further that he went immediately to the Sheppard home and found the defendant in the den, and ''I immediately went up to him and asked him what happened, words to that effect, and he said, 'I don't know exactly but somebody ought to do something for Marilyn,' and with that my wife immediately went upstairs and I remained with Dr. Sam and I said something to the effect of 'get hold of yourself' or something like that 'can you tell me what happened?' and he said, 'I don't know. I just remember waking up on the couch and I heard Marilyn screaming and I started up the stairs and somebody or something clobbered me and the next thing I remember was coming to down on the beach.' And that he remembered coming upstairs and that he thought he tried to do something for Marilyn and he says 'that's all I remember.' ''

Officer Drenkham who received a call from Mayor Houk at 5:58 a. m. and who got to the Sheppard home at 6:02 a. m. stated on direct examination as to what the defendant said as to his actions when awakened by Marilyn's screams:

''A. I asked the defendant what had happened. He said that he heard Marilyn scream that he remembered fighting on the stairs that he was in the water and then he came upstairs.''

Mrs. Esther Houk, wife of the mayor of Bay Village, who accompanied her husband to the Sheppard home, after going upstairs and viewing the revolting sight in the Sheppard bedroom, returned to the kitchen and poured out half a glass of whiskey and offered it to the defendant with the statement "this might help you." The record then discloses the following testimony by Mrs. Houk:

"A. He said, 'No, I don't want it. I can't think clear now and I have to think.'

"Q. And he did not take the drink? A. I asked him 'shouldn't this help?' but he is a doctor, he should know and he said, 'no.' So he didn't take it.

"Q. I see. Then what occurred from the den? A. I believe he was talking.

"* * *

"Q. What did he say? A. He complained of his neck. He said he thought it was broken. He mentioned kidding Steve about locking his house so tight. He said he remembered being hit at the top of the stairs and either he was chasing someone or someone was chasing him down the stairs. I remember that, because I couldn't picture anyone chasing him * * *."

The defendant's brother Dr. Richard Sheppard arrived shortly after Mr. and Mrs. Houk and Officer Drenkham and, after viewing Marilyn, returned to the den. Mayor Houk then testified that he heard the following conversation:

"Dr. Richard bent over Dr. Sam and I heard him say that 'she is gone, Sam,' or words to that effect, and Sam slumped further down in his chair and said, 'Oh, my God no' or words to that effect. And I then heard Dr. Richard say either 'did you do this?' or 'did you have anything to do with this?' and Sam replied, 'Hell, no.' "

Shortly after the foregoing conversation with defendant by those who first came to his house, Dr. Stephen Sheppard arrived with a doctor from Bay View Hospital (about 6:15 a. m.) and without consulting authorities took the defendant to Bay View Hospital.

On the following day, Dr. Hoversten testified about a call he made upon the defendant at the hospital, when he heard the following conversation between the defendant and Dr. Stephen Sheppard:

"A. Yes, I remember I was sitting on the left hand side of the bed and Steve sat near the foot of the bed and he advised Dr. Sam to go over in his mind several times a day * * * As I recall Dr. Steve addressed Dr. Sam and said in words to this effect: 'You should review in your mind several times a day the sequence of events as they happened so that you will have your story straight when questioned' and then he gave as an example 'you were upstairs and you went downstairs and from here to here,' and so forth."

An examination of the foregoing evidence shows that as successive inquiries were made of the defendant, his answers changed considerably. His first statement shows that he did not reach the top of the stairs before encountering someone or a form. No mention is made about "Chip" until the statement was made at the sheriff's office on July 10th. Likewise, the statements do not suggest that defendant examined the decedent on his first responding to her call, until after the green bag containing defendant's watch, ring and keys were found with blood on the crystal and band of the watch and such fact was called to his attention. There could be no possible way under the sequence of events as testified to by the defendant in which blood could have gotten on the watch unless it got there before the defendant had his alleged encounter on the beach.

When the defendant fell asleep on the couch in the living room on the evening of July 3rd he (by his own testimony) was wearing a T shirt, pants, loafers and a corduroy jacket. When the Houks arrived at 5:45 a. m. on July 4th defendant was bare from the waist up, and in his statements claims no recollection of what happened to the T shirt. The T shirt has never been found or accounted for. Chief of Police Eaton, when he arrived at 6:30 a. m. of July 4th, saw the corduroy jacket neatly folded on the couch where defendant had been sleeping, and Officer Drenkham had noticed the jacket in the same position upon his arrival at 6:02 a. m. No one of those who arrived at the Sheppard home prior to the Chief of Police testified as to having moved or touched the jacket. The defendant is not sure but says he has a faint recollection of having removed it while sleeping because he was too warm. Dr. Stephen Sheppard testified having observed the jacket on the floor. This

was prior to 6:30 a. m. However, when the photograph was taken at 8 a. m., the jacket was still in the position as observed by Officer Drenkham and Chief Eaton.

The officers who first arrived on the premises made a complete investigation of the house for evidence of any forcible entry and found all windows and screens locked, untouched and in place, the screens being fastened from the inside, and no damage was observed to any of the doors. Defendant testified that the doors of his home were never locked. However, Mrs. Ahern testified that before she left at midnight on the morning of July 4th, she locked the door and chained it on the lake side of the house and the maid testified to being locked out on one or more occasions when she came to work in the morning. She also testified that it was the practice to leave the street door unlocked on the mornings she was to report for work, which was on a fixed day each week. This testimony is supported by that of Dr. Hoversten who said that the first day he visited there in July, when he came home at about midnight, Marilyn called down to him not to lock the door because the maid was coming in the morning. The record clearly shows the maid was not expected on July 4th.

Officer Drenkham testified that he patrolled Lake Road during the night beginning about 11 p. m. and continuing until 5 a. m., passing the Sheppard home on several occasions, and noticed no one on the highway at or near the Sheppard home. He also examined the beach at the bottom of the steps by the beach house shortly after 6 a. m. and found no foot prints in the sand. Defendant produced two witnesses, one of whom reported that while driving east on West Lake Road at about 2:15 a. m. on July 4th he saw a big man over six feet tall and weighing 190 pounds standing in the Sheppard driveway wearing a light T shirt, but was unable to describe the rest of the dress. He testified that the stranger had a crew hair cut and was a bit tanned and that all this was observed in the dead of night while returning from a fishing party at Sandusky, Ohio. The witness had a boat attached to his automobile and testified he was driving 35 miles per hour when he observed the stranger in the drive near three maple trees. The other witness claims to have been driving west at about 4 a. m. when he observed a stranger

near the cemetery which is just west of the Sheppard home. He described the stranger as having a crew haircut, being 5′9″ tall and having bulging eyes and wearing a white shirt. Neither of these witnesses came forward until a reward was offered publicly six or seven days after July 4th, although the story of Marilyn Sheppard's death had received great publicity, including the story that defendant had met with a form with bushy hair in the Sheppard home after he heard his wife scream for help.

Defendant's testimony was given in support of his claim that his home life and that of his wife was loving and harmonious. As opposed to this evidence, Dr. Hoversten testified to conversation in which the witness read and discussed with defendant a letter which defendant had written and which he intended to mail to his wife, on the subject of divorce. The same subject was talked over on several occasions and there is some evidence that the defendant discussed this subject with Susan Hayes. There is also evidence that after Chip was born Mrs. Sheppard was not sexually aggressive and that she had consulted with defendant's brother Dr. Stephen Sheppard on the subject and its effect on her relationship with her husband (the defendant). Defendant admitted meeting with one of his lady patients, *at her insistence and request* on several occasions, taking her to Metropolitan Park on at least one occasion where they kissed each other, and being involved in an altercation between the lady and her husband about her attentions to defendant in Mrs. Sheppard's presence on a boat trip to Detroit. He called and was in company of another young lady in California while his wife was in Cleveland. His intimate relationship with Susan Hayes for more than a year was admitted by defendant, including his cohabiting with her at the home of Dr. Miller in California for about a week although when first questioned he denied any such affair and, upon the coroner's inquest, under oath he testified untruthfully on the subject by denying such intimacy.

When the officers arrived at the Sheppard home on the morning of July 4th they found a medical bag of defendant open and on its end with some of the contents spilled on the floor. Some of the drawers in the desk in the library were

pulled out and piled on the floor and the tools for defendant's outboard motor, which defendant kept in a green cloth bag in the desk, were on the floor in front of the desk, together with a broken statue. There was also a green box containing fishing tackle on the floor near the tools. Marilyn Sheppard's wrist watch with dry blood on the band was lying on the floor near the desk. The contents of one drawer had been spilled out after Dr. Richard Sheppard accidentally kicked it over. The drawers in the desk in the living room were partly pulled out but the contents thereof were undisturbed. The lid or cover of the desk was open and resting on the back of one of the upholstered living-room chairs. There were some sales tax stamps and papers scattered about on the floor near the desk.

The Cleveland police department fingerprint expert testified that there were no readable fingerprints on the desks or in other places about the house; that they had been wiped off or smudged; and that on some of the furniture surfaces he found long scratches, as if the surfaces had been wiped with sandpaper or a rough cloth of some kind. This was equally true of the metal fishing box and drawers piled in the den.

The picture of Mrs. Sheppard's left wrist showed an impression of the wrist band of her watch in dry blood, as if the watch had been pulled from her wrist after the blood had dried about the wrist band. About 1:30 p. m. the afternoon of July 4th, the mayor's son, while searching the bank which extends down to the lake in front of the Sheppard home and which is covered with very heavy brush, found the green cloth bag containing the defendant's wrist watch, which had stopped at 4:15, with dry blood on the band and crystal, and also containing his class ring and key chain. The hour at which the watch was stopped was 15 minutes after the latest time fixed by the county coroner as the time Marilyn Sheppard came to her death (between 3 and 4 a. m. on July 4th). There was no blood on the bag and there is no dispute that the green bag was the one used by defendant to hold his outboard motor tools, and that he kept them in his desk in the den.

There was over $200 found in various places about the house, including defendant's wallet which contained $63 and a check for a large sum of money, all of which was easily dis-

covered by the chief of police. Defendant testified that he discovered his wallet, which had been in his pocket, on the floor beside him after he came to in the bedroom. Except for the green cloth bag, defendant's watch, ring and key chain, there is no evidence that anything was missing from the Sheppard home.

Defendant in his argument to the jury said:

"Well, of course, we don't claim there was a burglary. I mean I don't know why the intruder was there. We claim there was a man there but whether he was there for burglary or not I don't know. We never claimed that he was."

The evidence of the somewhat disarranged condition of the first floor of the house would tend to show the presence of an intruder, but if because of the manner in which it was done and the other surrounding circumstances no such conclusion could be reasonably drawn from the evidence, such condition would give strong support to the state's case. The defendant also argues that decedent came to her death at the hands of a sex maniac by whom defendant was "clobbered" in his bedroom or on the stairway to the second floor and on the beach. It would be difficult to believe that a sex maniac, after discovery, would take time to set up the appearance of a burglary, or that a burglar would throw away the only property found to have been taken from the house, the green cloth bag containing defendant's wrist watch, ring and key chain.

It is also hard to believe that a burglar would not have found and taken defendant's wallet which he says was on the floor beside him after he encountered the form in the bedroom, and other monies that were about the house, or that either a burglar or a sex maniac would take time or go to the trouble of destroying fingerprints after the defendant was aroused from his sleep, or that such person, armed with a blunt instrument, would go about his intended purpose without molesting the defendant whose presence asleep on the couch could not have been missed.

When the defendant went to sleep on the couch the green bag containing the tools was in the desk and the defendant was wearing his wrist watch, ring and key chain.

By defendant's own testimony, when responding to his

wife's screams for help, he did not turn on the lights either on the stairway, while on his way to the bedroom, or in the bedroom. Light switches were conveniently placed for that purpose. That it was then in the dead of night is clearly shown because when he was following the form to the beach he said it was dark, with some reflection from Cleveland, and after coming to and starting back to the house, he testified the day was just breaking. The discovery by defendant that his wife had been so badly beaten "that he felt she was gone," particularly when he returned from the beach and made, as he claimed, his second examination of her, that he should do so without light, is a fact which the jury had the right to consider, together with all of the other evidence of his conduct and the surrounding physical facts, in determining the credibility to be given his story. Even though day was breaking, the evidence was undisputed that the window shades were drawn in the murder room, except as to one window which was up six inches to let in air. There is evidence in the record by a neighbor that she drove by the Sheppard home at 2:15 a. m. on July 4th and saw two lights burning, one on the first floor toward the east side of the house, and one on the second floor.

No mention is made by defendant about the family dog, although he testified that the intruder must have been white, because the dog always barks at colored people. The defendant did not hear the dog bark or at least he gave no testimony to that effect.

One significant fact to be considered is the passing of time between the time of Marilyn Sheppard's death and the time defendant summoned help, and what all the activities were that engaged the defendant's attention during that period.

The coroner fixed the time of death as between 3 and 4 a. m. on July 4, 1954. The first call by defendant asking for help was made between 5:45 a. m. and 5:50 a. m. of that day. The defendant testified that when he followed the form to the beach, it was in the dark of night with some reflection of light from Cleveland. At the time he came to on the beach, he testified that it was at about the break of day. It is a matter of public information that on July 4, 1954, the sun rose at 4:58 a. m., eastern standard time, or 5:58 a. m., eastern daylight savings

time. The break of day precedes sunrise by about forty minutes. So that either between the time of death fixed by the coroner, at which time defendant testified he was in the bedroom where decedent died, having responded to her call for help, and in his testimony expressed the belief that she was then gone, or from the time defendant started from the beach to the house after encountering the form there(defendant's testimony being the only authority for this fact) from forty minutes to two hours passed. There is little or no attempt to account for defendant's actions during this period. It is also true that there were neighbors on both sides who were not disturbed. They were much closer in point of distance to the defendant than was Mayor Houk.

The evidence shows also that there was a telephone between the twin beds in the murder room which was not used by defendant to call help after he regained consciousness from his first encounter with the form either on the stairs or in the bedroom. Likewise, when chasing the form to the beach, the defendant did not avail himself of any weapon although there were firearms available in the den and fire tools in the fireplace in the living room which he passed in going out the door to the lake side of the house.

The defendant's injuries were the subject of some conflicting testimony. Doctors testifying for the state described his injuries as injuries to the right cheek of the face, a black eye, some damage to the right side of his forehead, some damage to the membrane of his mouth, and no indication of any injury to the back of the neck. Doctors for defendant not only report the injuries to the right side of his face, eye and mouth but also injuries to the spinous process of the second cervical vertebrae and some swelling on the back of the neck. They do not claim that the skin was broken at this point. Whatever injuries the defendant sustained were caused by a blow or blows of the fist of an assailant. This was defendant's testimony, although he testified that his first encounter was in the bedroom where his wife came to her death as a result of many blows on the head with a blunt instrument. It was on this occasion and only then, that the defendant claims that there might have been two assailants ''one working over his wife'' and the other strik-

ing defendant from the back with his fist. While he was following the form to the beach there was no suggestion that there was more than one object or form in front of him.

The foregoing is a summary of much of the evidence dealing with many of the physical facts and conditions of the premises as found on July 4th and of declarations and actions of the parties involved as testified to by the public authorities and other witnesses, together with what the defendant said to others and in his testimony upon trial in relation to the events of the morning. The testimony of the defendant, in dealing with the events that took place in his presence or the things that he did, was characterized by the state as vague, indefinite, uncertain or factually highly improbable. During the time he was under cross-examination the defendant gave evasive answers such as "I can't recall" or "I can't remember" approximately 216 times to questions concerning facts and circumstances that took place in his claimed presence and were material to the issues in the case.

The jury, under the instructions of the court, was presented with but one question or issue of fact and that was, had the state shown beyond reasonable doubt that the defendant purposely killed Marilyn Sheppard?

The state's case is based in part on circumstantial evidence. The law of Ohio on this subject requires that the facts and circumstances upon which the theory of guilt is based must be established beyond reasonable doubt, and the facts so established must be entirely irreconcilable with any claim or theory of innocence and admit of no other hypothesis than the guilt of the accused. *Carter* v. *State,* 4 Ohio App., 193.

If, therefore, the jury, after careful deliberation, found that there was any possible hypothesis of innocence, after a consideration of all of the evidence, then the defendant would be legally entitled to be discharged, but if the jury found, after full deliberation, there was no possible hypothesis of innocence based on the facts as they found them to be, and that the facts found are such as to be irreconcilable with any other reasonable hypothesis than the guilt of the accused, then a verdict of guilty was required.

This was a jury question and we hold that there was suf-

ficient evidence to support the verdict of guilty as found by the jury.

Claims of error Nos. 17, 18, 24, 25, 26, 27, 28 and 29 are therefore overruled.

Assignments of error under the heading of "The admission of testimony" in subhead IV of defendant's brief will next be considered. During the trial, pictures in color that had been taken of the wounds of Mrs. Sheppard's head, after the blood had been washed away, were shown. Six black and white pictures were developed from these negatives and received in evidence, which were explained by the deputy county coroner. The colored pictures were then shown to the jury through the use of a projecting machine on a screen six feet by six feet, the pictures being four feet square. It is claimed that such pictures exaggerated the size of the wounds and unfairly emphasized the evidence of the cause of death. Except for the size of the pictures, there is no claim that they were distorted or inaccurate. They dealt with a subject vital to one of the issues of fact, that is, the cause of death and the severity of the blows.

In the case of *Cincinnati Traction Co.* v. *Harrison*, 24 C. C. (N. S.), 1, 34 C. D., 435, on page 6 the court said on this subject: "As to the photograph, it was an enlarged one, *but was not for that reason inadmissible.*" (Emphasis added.)

The defendant was not prejudiced by the manner of showing these pictures.

It is further claimed that the testimony of Mrs. Ahern with regard to conversations she had had with the decedent about divorce was improperly received in evidence. She testified that Mrs. Sheppard had told her that the defendant had discussed the possibility of seeking a divorce from her with Dr. Chapman while in California. At the very outset of the trial the defendant stated as a fact that he and his wife were happy and living a harmonious and lovable married life, and on his defense he testified to support such statement. Aside from the alleged conversation between Mrs. Ahern and the decedent, there is considerable testimony as to conversations the defendant had with others (particularly Dr. Hoversten and Miss Hayes) on the subject of divorce, such conversations being in part admitted by the defendant. He, however, denies ever suggesting

seriously a separation with his wife and maintains throughout that they lived happily together. Statements such as were given in evidence or testified to by Mrs. Ahern as a statement made by the decedent are always admissible to show that the statement was made or to establish the state of mind of the parties where their relationship is material to the issues in the case.

In the case of *Cassidy* v. *Ohio Public Service Co.,* 83 Ohio App., 404, 83 N. E. (2d), 908 (a negligence case), the court at page 410 quotes with approval from 6 Wigmore on Evidence (3 Ed.), 185, Section 1770, as follows:

"*Where the utterance of specific words is itself a part of the details of the issue under the substantive law and the pleadings,* their utterance may be proved without violation of the hearsay rule, because they are not offered to evidence the truth of the matter that may be asserted therein."

Also, in Section 1730 on page 94 of the same work, headed "Statements of Emotion (Bias, Fear, Malice, Affection, etc.) Wife's or Husband's Declarations":

"* * * *

2. A special application is also found in actions for alienation of affections, criminal conversation, divorce, or *wife-murder, where the state of affections of the wife to the husband, or of the husband to the wife,* becomes material. Here, the declarations of the person as to her or his own state of affections are admissible under the present principle * * *." (Hearsay rule.) (Emphasis added.)

In 31 Corpus Juris Secundum, 988, title "Evidence," Section 239, dealing with independent relevant statements, it is said:

"Where the fact that a particular statement was made is of itself a relevant fact, regardless of the truth or falsity of such statement, the statement is admissible in evidence as an independent relevant fact."

The cases cited by defendant are not in point. *Potter* v. *Baker,* 162 Ohio St., 488, 124 N. E. (2d), 140, deals with spontaneous statements of third persons at the time of an accident. *Geller* v. *Geller,* 115 Ohio St., 468, 154 N. E., 727, was concerned with the letter of an unknown third person and the other cases are likewise far afield from the legal question here being considered.

Even if it be argued that there is no sound legal basis for the inquiry of what the deceased said of statements of defendant to Dr. Chapman about divorce, yet, because of the state of the record on that subject, the defendant's admitted relationships with other women which came to the knowledge of the decedent and the watch incident which was a part of the same conversation between the decedent and Mrs. Ahern (the watch given to Susan Hayes having been previously the subject of some slightly animated discussion between defendant and his wife), we do not find that the defendant was prejudicially affected by the admission of this evidence about which he complains.

Defendant complains also about the admission of testimony given by Mrs. Houk that the defendant told her that in an automobile accident where no physical injury is apparent, a head injury could be easily claimed.

In view of the highly controverted state of the record as to whether or not the defendant sustained an injury to the back of his neck and head we find no error in the admission of this testimony.

Defendant also complains about the extensive cross-examination of the defendant about Margaret Kauzor and Mrs. Lossman and the calling attention to the defendant's untruthful testimony given under oath at the coroner's inquest about his relations with Susan Hayes. The defendant also claims as error a question directed to the defendant on cross-examination which assumed that defendant killed his wife, to which the defendant answered, "That is absolutely untrue and unfair." The question certainly was proper under the circumstances.

The defendant also claims error in permitting Mayor Houk to testify to submitting to a lie detector (polygraph) test. The record shows that Dr. Stephen Sheppard at one point in the investigation, indicated that Mayor Houk was in some way involved. After this was brought out the Mayor was asked, "Did you, Mr. Houk, submit to a lie detector test?" to which he answered over defendant's objection, "Yes." The results of the test were not inquired about, and the simple fact that a test was made by agreement of the witness under the circumstances could not prejudice the defendant's case.

We likewise overrule the claims of error because of the claimed "unfair and biased testimony of the coroner." If the coroner, in his testimony, was not testifying within the orbit of his personal knowledge, cross-examination is the weapon within the use of the defendant to demonstrate that fact before the jury, to the damage of the state's case.

The foregoing claims of error are therefore overruled.

Errors concerned with the exclusion of testimony are grouped by the defendant under the title "The court erred in exclusion of testimony."

The first claim of error under this heading is the refusal of the court to require the coroner to produce certain records on the claim that they were public in character.

The records referred to were the work sheets of the technicians of the coroner's office. These papers are not of the character of "public records," and no error was committed by refusing to direct their production in court.

The failure to order the coroner to produce a police report that had been given to him by the police department is not error. This report is the same one that was later received in evidence, and, while the court's ruling holding that the coroner need not produce a police department record was correct, its later introduction would cure any possible error.

The defendant claims that he was restricted in his cross-examination of Dr. Hexter on the subject of shock, and as to the cross-examination of Officer Schottke on whether or not the defendant co-operated in the police investigation of the cause of his wife's death. Neither of these claims is well founded. After an objection to a question put to Dr. Hexter was sustained because of its form, the defendant conducted a searching cross-examination of the doctor on the subject of shock. Whatever restriction the defendant suffered by the court's sustaining the objection claimed as error was fully corrected by subsequent questions which were fully answered. The questions to Officer Schottke asked for conclusions of fact and the state's objections were properly sustained.

The next claim of error under this heading is the court's refusal to permit evidence on what the defendant calls similar offenses or other acts of burglary committed or attempted in

Bay Village. It is the claim of the defendant that homes of two citizens of Bay Village were entered by intruders, one in September and the other on July 7, 1954. We know of no theory of law that would make such testimony competent in this case. The court was not in error in ruling against the introduction of this evidence.

The remaining claims of error under this heading are concerned with the court's failure to permit a juror to question the defendant while he was testifying in his defense, refusing to allow Don Ahern to give opinion evidence as to whether or not the defendant was a "deep sleeper" and, also, in sustaining objection to questions to Dr. Adelson, the pathologist of the coroner's office, as to his opinion of the cause of the wounds on the hands of Mrs. Sheppard.

The right of a juror to ask questions of a witness during trial is clearly within the sound discretion of the trial court. *State* v. *Anderson,* 108 Utah, 130, 158 P. (2d), 127, 159 A. L. R., 340. The practice is not encouraged because:

"Generally jurors are not familiar with the rules governing the admission of evidence and in the very nature of such a situation counsel quite naturally will hesitate to object to a question propounded by a juror even though it may be incompetent, and this practice is so dangerous to the rights of the litigant that we cannot encourage the practice." *White* v. *Little,* 131 Okla., 132, 268 P., 221.

For further authorities see annotation following the case of *State* v. *Anderson, supra,* in 159 A. L. R., at page 347.

This claim of error is, therefore, overruled.

The other two claims of error just above listed are likewise overruled, the questions involved not being material to the issues in the case.

Assignments of error listed in paragraph 6 of defendant's brief entitled "Errors in conduct of trial" will now be considered.

During the trial of the case (which lasted about five weeks, the bill of exceptions being bound in 12 volumes, totaling 7,102 pages, together with a supplemental bill of exceptions containing the opening statements, of 206 pages) the court suggested on a few occasions that the proceeding was not going forward

with sufficient dispatch, and on one occasion the court said that it should not take over a day to determine the cause of death. There are other complaints of the defendant because of remarks of the trial judge, of which the following is typical:

"The Court: Well, Mr. Corrigan, we can't go on with this witness forever. We will have to somehow or other get through with the witness.

"Mr. Corrigan: Well, he has not got his pictures here.

"The Court: Well, in any event, we are making too much of a ritual of every bit of movement, and I don't think we ought to take the time. It is not fair to these jurors nor fair to anybody.
"* * *

"Mr. Corrigan: Now, Your Honor, I am here to defend a man for murder.

"The Court: I know, but we try other murder cases too. We have to try other people as well."

There was also some discussion before the jury about the defendant demanding the return of the keys to his house, which he claims were necessary for him to have in making out his defense. This claim is countered with proof that defendant or his representative was at liberty to go to his house at any time, on request, when in the company of a police officer.

It is likewise claimed that there was disorder during the trial, and defendant in his brief lists 11 places in the record where order was called for because of noise in or out of the courtroom.

It is claimed also that the court arranged the courtroom to accommodate a great many representatives of the press, radio and television and other news-disseminating agencies, thus restricting accommodations available for others. The record shows that the defendant's family was provided for and that the defendant's brother Dr. Stephen Sheppard, although a witness, was permitted by order of the court to remain in the courtroom throughout the trial. The court in this case was presented with a very difficult matter because of the unusual amount of coverage attempted by the press, radio and television agencies. The arrangements made by the court were within its sound discretion. Certainly the defendant was afforded a public trial,

and from a reading of the record, we cannot say that the court in seeking to maintain an orderly proceeding abused its discreiton in directing the courtroom arrangements.

*Pierpont* v. *State,* 49 Ohio App., 77, 195 N. E., 264; *Makley* v. *State,* 49 Ohio App., 359, 197 N. E., 339.

It is claimed also that the jury was not properly admonished upon separation during the trial.

A careful examination of the record as to each of the foregoing claims of error shows that the proceedings were regular in every respect, and the claims of error are, therefore, overruled.

It is likewise claimed in this section that the court should have charged on the included offenses of "assault and battery and assault," and that in holding the jury together for five days after submission of the case, coerced them into agreeing on a verdict.

The claim that assault and battery and assault should have been charged must be overruled. There is no question but that decedent was killed as a proximate result of the unlawful wounds inflicted upon her person. Death, without question of doubt, resulted from the unlawful acts of the killer, and the only factual issue in the case being whether or not the defendant committed the various assaults on her person. The case of *Bandy* v. *State,* 102 Ohio St., 384, 131 N. E., 499, 21 A. L. R., 594, cited by defendant, is direct authority against this claim of error. Paragraph two of the syllabus provides:

"2. If the indictment charges murder in the first degree in the perpetration of a robbery, under Section 12400, General Code, and there is no evidence tending to support a charge of murder in the second degree, or manslaughter, as distinguished from murder in the first degree, then the defendant, upon the failure of proof as to murder in the first degree, is entitled to an acquittal, and, in such case, it is not error for the court to refuse to charge either murder in the second degree or manslaughter."

See, also, *State* v. *Muskus,* 158 Ohio St., 276, 109 N. E. (2d), 15, 33 A. L. R. (2d), 452.

The case was submitted to the jury on the morning of Friday, December 17th. At the noon hour the jury was put under

the care of two bailiffs who were sworn and instructed as to their duties. The deliberations of the jury continued through Saturday and Sunday, the defendant objecting to the Sunday session. On Monday evening, no communication having been received from the jury as to their progress, the court instructed the parties that at 10 p. m. the bailiff should inquire as follows:

"Have you arrived at a verdict? If not, is there a probability that you can arrive at one if you deliberate a while longer, either this evening or tomorrow? If so, which would you prefer?"

The jury's reply was that they were close to a verdict and desired to retire at that time and resume deliberations in the morning. The jury returned its verdict on Tuesday, December 21, 1954, at 4:33 p. m.

At no time during their deliberations did the jury or any member of the panel, suggest that there was no hope of a verdict or that they did not desire to continue their deliberations. The jury was called into open court three times a day during deliberations so that there were many opportunities for them to express their feelings if they desired to do so. With the great number of exhibits and 7,102 pages of evidence, the jury was unquestionably painstaking in its approach to the serious question presented to them, and their willingness to take whatever time was reasonably necessary under the circumstances to do justice between the state of Ohio and the defendant cannot be grounds for criticism. We do not find that there is any basis for the claim that the jury was coerced into a verdict.

The claims of error under the heading, "Errors in conduct of trial," are, therefore, overruled.

The defendant groups assignments of errors Nos. 14, 22 and 23 under the title, "The court erred in its charge to the jury."

The defendant requested the court to reduce its charge to writing as provided by Section 2945.10, Revised Code, which provides:

"(G) The court, after the argument is concluded and before proceeding with other business, shall forthwith charge the jury. Such charge shall be reduced to writing by the court if

either party requests it before the argument to the jury is commenced. Such charge, or other charges or instruction provided for in this section, when so written and given, shall not be orally qualified, modified, or explained to the jury by the court. * * *,,

Before the trial was concluded, the court had written its charge, and a copy given to counsel for the state and for the defendant before argument. The trial came to an end after counsel for the state concluded its final argument to the jury at about 4:15 p. m., Thursday, December 16, 1954. The court then addressed the jury as follows:

"The Court: Ladies and gentlemen of the jury we will now be adjourned until, shall we say, nine o'clock tomorrow morning. I would like to get a fairly early start, but if we are not all here at nine o'clock we will not, of course, until we are all here, but as soon as possible after nine o'clock I would like to have the court convene. In the meantime, will you be very careful—now we are in the closing stages—not to discuss this case or reach any point whatever where you are seeking or securing any information or notions or statements from anybody about it. The law of this state provides that when a jury is charged with the final word in the case, and a jury proceeds in the secrecy of its jury room to deliberate and to determine the issues that are to be determined, that from that point on, and continuing until such time as they and the court together, if that should have to come to pass, are not able to agree—or rather, they and the court are agreed that the jury cannot agree upon a verdict, or a verdict is rendered, the jurors must be kept together. This case is important. It may take you a short time, nobody knows. It may take you some time, nobody knows. But, in any event, I am sure you appreciate that fact that it is a case that does need deliberation and care in its decision, whatever that decision may be, and for that reason, it may go over tomorrow. If it does, it will be necessary for you to remain in the comfort—some people think it is a discomfort—of a down-town hotel. The Court will take care of all of those details, if they are to be taken care of, so I am saying to you now so that you may come tomorrow morning prepared, if necessary, to remain in a downtown hotel tomorrow night under the care and as guests of the court and its officers,

"Mr. Corrigan: I except to the instructions of the court.

"The Court: Sir?

"Mr. Corrigan: I except to your instruction.

"The Court: What is erroneous about it?

"Mr. Corrigan: I say, I except to your instructions.

"The Court: Oh, yes, all right. Without any formality at all, we will be adjourned until 9 o'clock tomorrow morning. (Whereupon adjournment had.)"

Court was then adjourned until 9 a. m., Friday, December 17, 1954. At that time, in the absence of the jury, the defendant excepted to parts of the written charge on reputation and character evidence and on the law as to circumstantial evidence, and presented requested charges in writing, which requests were overruled. The court then proceeded to read its written instructions to the jury in open court without deviation from the prepared charge.

The record does not show that any other business of the court was conducted between the closing of court on December 16 and the opening of court on December 17, 1954.

From the foregoing recital of the record, it is clear that no part of the court's instructions on the law of the case was given on December 16th, and that the entire charge on the law was in writing as requested by defendant. Section 2945.10, Revised Code, was strictly complied with, so that claims of error that the court failed to reduce its charge to writing, that part was given one day and part the next, and that the court failed to give its charge immediately after concluding arguments, must all be overruled.

The duty to proceed to charge the law of a case as required by Section 2945.10, *supra,* means to proceed within the regular hours of the court day which are provided for by Rule 23-C of the Common Pleas Court of Cuyahoga County.

The defendant assigns as error under this division of the brief (error No. 23) that the court refused to give written instructions on points of law before argument. This error is claimed, but there is no argument in support of it in the brief.

Section 2945.10 (E), Revised Code, provides:

"When the evidence is concluded, either party may request instructions to the jury on the points of law, which instructions shall be reduced to writing if either party requests it."

This section empowers, but does not require, the court to give such instructions. The following cases support the court's denial of such request, and there is no claim that the substance of such requests was not included in the general charge of the court. *State* v. *Petro,* 148 Ohio St., 473, 76 N. E. (2d), 355, 5 A. L. R. (2d), 425; *Grossweiler* v. *State,* 113 Ohio St., 46, 148 N. E., 89; *Wertenberger* v. *State,* 99 Ohio St., 353, 124 N. E., 243; *State* v. *Williams,* 85 Ohio App., 236, 88 N. E. (2d), 420; *State* v. *Cheatwood,* 84 Ohio App., 125, 82 N. E. (2d), 770.

There remains to consider the court's charge on the subject of the use of character evidence, and the rule to be followed when the state's case depends entirely or in substantial part on circumstantial evidence.

On the first question, the court charged the jury as follows:

"Some evidence has been given in this case concerning the claimed general conduct and reputation of the defendant and it is proper to present such evidence for your consideration. It is not admitted because it furnishes proof of guilt or innocence, but because it is a matter of common knowledge that people of good character and reputation do not generally commit serious or major crimes. Such evidence, if believed, may be of some help to you in your consideration of the total evidence and the situation as a whole. The court wishes to caution you, however, that good character and good reputation will not avail any person charged with a crime against proof of guilt beyond a reasonable doubt."

This charge is fully supported by the holding of this court in the case of *State* v. *Neal,* 97 Ohio App., 339, 118 N. E. (2d), 424 (motion to certify overruled. Appeal dismissed, 162 Ohio St., 212). We hold that the law was correctly stated by the court.

*Harrington* v. *State,* 19 Ohio St., 264; *Stewart* v. *State,* 22 Ohio St., 477.

Paragraph four of the syllabus of *Stewart* v. *State, supra,* provides:

"In a criminal case it is error to instruct the jury that evidence of the defendant's good character is not to be considered by the jury, or made available to the defendant, except in doubtful cases; *the true and proper rule being to leave the*

*weight and bearing of such evidence to the jury.* *Harrington* v. *The State,* 19 Ohio St., 268 [264], approved.'' (Emphasis added.)

The charge on circumstantial evidence was as follows:

''* * * Where circumstantial evidence is adduced, it together with all the other evidence must convince you on the issues involved beyond a reasonable doubt, and that where circumstantial evidence alone is relied upon in the proof of any element essential to a finding of guilty, such evidence, together with any and all other evidence in the case, and with all the other facts and circumstances of the case as found by you, must be such as to convince you beyond a reasonable doubt and be consistent *only* with the theory of guilt and inconsistent with any theory of innocence. If evidence is equally consistent with the theory of innocence as it is with the theory of guilt, it is to be resolved in favor of the theory of innocence.''

The request of the defendant is in substance the same as the charge as given, and as given is fully supported by the case of *Carter* v. *State,* 4 Ohio App., 193. The defendant's claims of error Nos. 14, 22 and 23 are overruled.

Finally, paragraph 8 of defendant's brief claims ''Errors in overruling the motion for new trial.''

There is some claim that the jurors were allowed to separate and to communicate with outsiders by telephone during their deliberations. A photograph was taken of the jury in the dining room of the Carter Hotel. Their separation was only sufficiently far apart to enable a separate picture of the men and women to be taken. The jurors remained in their respective immediate presence except for sleeping purposes. All telephone communications were to members of the family of the jury, and there is no evidence that these telephone calls, made in the presence of a bailiff, were anything but proper.

We have given full consideration to the question of the sufficiency of the evidence as supporting the verdict in this case in another part of this opinion dealing with the motion to direct a verdict, and it seems unnecessary to restate what was said there. For the reasons stated in that part of this opinion, we hold that the court was fully justified in overruling the motion for new trial.

The record in this case was most extensive, and the briefs presented by counsel, although likewise extensive, have been of great assistance to this court in the work of resolving the legal questions presented, it being remembered that a reviewing court is not called upon to determine questions of fact relating to the guilt or innocence of the defendant, a function which in the first instance is solely within the province of the jury. This court, in overruling the many assignments of error, is unanimously of the opinion that the defendant in this case has been afforded a fair trial by an impartial jury, and in the opinion of this court substantial justice has been done. Section 2945.83, Revised Code, in part, provides:

"No motion for a new trial shall be granted or verdict set aside, nor shall any judgment of conviction be reversed in any court because of: ·

"* * *

"(C) The admission or rejection of any evidence offered against or for the accused unless it affirmatively appears on the record that the accused was or may have been prejudiced thereby;

"(D) A misdirection of the jury unless the accused was or may have been prejudiced thereby;

"(E) Any other cause unless it appears affirmatively from the record that the accused was prejudiced thereby or was prevented from having a fair trial."

A careful study of the record and the authority of the foregoing section of the Code of Criminal Procedure require that the judgment be affirmed.

*Judgment affirmed.*

Kovachy and Hurd, JJ., concur.

*Mr. Frank T. Cullitan,* prosecuting attorney, *Mr. Saul S. Danaceau* and *Mr. Thomas J. Parrino,* for appellee.

*Messrs. Corrigan, McMahon & Corrigan, Mr. Fred W. Garmone* and *Mr. Arthur E. Petersilge,* for appellant.