JOURNAL ENTRY AND OPINION
{¶ 1} This is an appeal by Michael Buehner of his convictions on two counts of murder, one count of attempted murder and a three-year gun specification, following a jury trial before Judge Peggy Foley Jones. He contends that it was error to allow the jury to submit written questions to witnesses, that his lawyer was denied the opportunity to object to the judge's responses to jury questions during its deliberations, and that his conviction for attempted murder was based on insufficient evidence. We reverse Buehner's conviction for attempted murder, and affirm in all other respects.
 {¶ 2} From the record we glean the following: In the early morning hours of May 24, 2001, Buehner received a telephone call at his home on Ottawa Avenue in Cleveland. With Randy Price driving Buehner's black pickup truck, the two men proceeded to East 91st Street and stopped. An unidentified black male got into the cab next to Buehner and the three drove off northbound.
 {¶ 3} At that same time, people were socializing outside of 9314 Marah Avenue in Cleveland, the home of Lawone Edwards. Henry Harris, who was standing in Edwards' driveway, testified at Buehner's trial that Edwards and Jerry Saunders were selling drugs to passing motorists near the corner of Marah and East 93rd. Edwards admitted that he and Saunders were, indeed, selling crack cocaine there that morning when a pickup truck stopped and its black male passenger asked about buying one hundred dollars' worth of crack. Edwards and Saunders jumped into the bed of the truck and told the white male driver to go east and then told him to stop near a home at 9520 Marah.
 {¶ 4} Edwards claimed that when he and Saunders got off the truck, he stood five to six feet in front of the truck to act as a lookout and Saunders went to the truck's passenger door. Edwards testified that the unidentified black man got out of the truck and told Saunders to deal with the white male, later identified as Buehner, in the "middle" seat of the cab, and the driver remained in the truck but did not appear to participate in the discussion that followed. As Saunders, leaning through the window of the open truck door, prepared to conclude the drug transaction, Edwards said he asked Buehner to show him his money before he gave him the crack cocaine. He claimed that Buehner quickly pulled a gun and said something to the effect of "Here's your money right here."[1] Edwards stated that Saunders then turned to his right and started to run and that Buehner shot either once or twice at Saunders, who ran a short distance and collapsed. Edwards said that the "shooter" then pointed the gun at him and he turned and ran southeast across a vacant lot and eastbound through several backyards. He claimed he heard two or three more shots as he ran, and then he hid under a parked car in a driveway a few houses away until the occupants of the pickup drove away. He stated that Buehner, on foot, and Price, still in the pickup, attempted to find him in the backyards of homes to the east of 9520 Marah but abandoned their search when he heard one of them tell the other to forget about him and "get the drugs, [and] get the money."
 {¶ 5} Harris claimed he saw the unidentified black man in the black truck approach Saunders' body and rummage through his pockets. Price stated that Buehner briefly approached the body to confirm that Saunders was dead, but did not take anything from Saunders' person. Although Edwards and Harris were certain that the unidentified black man climbed onto the truck bed when Price and Buehner drove away, Price claimed that the black man ran away once Buehner began firing his gun, and he never saw him again.
 {¶ 6} Price claimed that Buehner told him that he shot Saunders because he had sold him $450 in fake "wet" cigarettes earlier in the day.[2] Price also testified that Victoria Thomas, Buehner's grandmother, drove him back to the scene of the shooting later that afternoon, and that they attempted to locate any spent shell casings that Buehner may have inadvertently left behind. Thomas denied this allegation and stated that when she retired for the night at about 1:30 a.m. on May 24th, Buehner was sound asleep on her living room sofa.
 {¶ 7} Saunders had been shot twice. One bullet when through his left arm, entered his chest cavity, and pierced his left lung, heart and right lung. The trajectory of this bullet was back to front and slightly downward through the body. Another bullet entered Saunders' rear upper leg and exited out his right thigh. This bullet traveled in a slightly upward path exiting about four inches higher than where it entered. The absence of any gunshot residue on Saunders' body or clothing was evidence that the person who shot him fired his gun from a distance of more than four feet. Cleveland Homicide Detective Sahir Hasan responded to the shooting after 3:00 a.m. and supervised the collection of evidence, including Saunders' red Philadelphia Phillies baseball cap, Edwards' blue Denver Broncos leather jacket, one spent nine millimeter shell casing, and a spent bullet which had lodged in the exterior of the home at 9520 Marah Avenue. The bullet recovered from the crime scene and the bullet taken from Saunders' body were fired from the same gun. At Det. Hasan's direction, numerous photographs were taken of the scene. Later that day, he interviewed Saunders' relatives, who identified Edwards as a person who might have knowledge of the shooting.
 {¶ 8} In early June 2001, after Edwards was arrested in connection with a pending drug-offense arrest warrant, Det. Hasan interviewed him and obtained a detailed description of all three occupants of the black pickup truck; specifically, that the "shooter" had tattoos on his arms and some sort of mark or scar by his right eye, which is consistent with Buehner's appearance. Det. Hasan also learned from other police personnel, under circumstances not detailed in this case record, that Price and Buehner were suspects in the shooting. In July 2001, Det. Hasan interviewed Price, who denied any knowledge of the incident. Det. Hasan showed Edwards a photo array and he identified Price as the driver of the black pickup. When shown a different photo array containing Buehner's photograph, however, Edwards could not confidently identify Buehner as the shooter and asked Det. Hasan to arrange for a physical lineup.
 {¶ 9} In November 2001, Price's girlfriend told Det. Hasan that Price had admitted being involved in the shooting and Price was arrested. Viewing a lineup, Edwards positively identified Price as the driver and Price was charged with two counts of aggravated murder, with firearm and death penalty specifications. He was also charged with one count of attempted aggravated murder and one count of aggravated robbery, both with firearm specifications.
 {¶ 10} Price implicated Buehner as the person who shot Saunders, Buehner was arrested and, after viewing another lineup, Edwards identified him as the shooter. Buehner was also charged with two counts of aggravated murder,[3] with firearm and death penalty specifications; and, one count of attempted aggravated murder and one count of aggravated robbery, each with firearm specifications. Price pleaded guilty to one count of involuntary manslaughter and one count of aggravated robbery, and was awaiting sentencing on these charges at the time of Buehner's trial.
 {¶ 11} Prior to trial, the State amended Buehner's indictments to delete all death penalty specifications and, following trial, the jury returned guilty verdicts on two lesser-included offense charges of murder and one lesser-included charge of attempted murder, along with all gun specifications, but returned an acquittal as to the aggravated robbery charge. On the murder convictions that were merged, Buehner was sentenced to fifteen years to life, and he was sentenced to nine years in prison on the attempted murder conviction, to run concurrent to the murder sentence, and the mandatory three-year consecutive sentence on the firearm specifications, for an aggregate total sentence of eighteen years to life in prison. Buehner now appeals.
 I. DUE PROCESS AND JURY QUESTIONS TO WITNESSES {¶ 12} Buehner asserts that he was deprived of his constitutional rights to due process of law and trial by a fair, impartial jury when the judge allowed jurors to submit written questions to be asked of witnesses. We disagree.
 {¶ 13} This court has very recently confronted this issue inState v. Richards:[4]
"In State v. Gilden,[5] the First District Court of Appeals found that permitting jurors to submit written questions to the judge for submission in open court to testifying witnesses, after the judge had an opportunity to review them for evidentiary propriety and the parties were given opportunity to lodge objections to specific questions, was a per se violation of a defendant's right to due process of law, to trial by a neutral jury and, by extension, the right to counsel. The court noted,
The most obvious problem with allowing jurors to question witnesses is the unfamiliarity of jurors with the rules of evidence. * * * Other potential problems include (1) Counsel may be forced to either make an objection to a question in front of the juror who asks the question, at the risk of offending the juror, or withhold the objection and permit prejudicial testimony to come in without objection; (2) juror objectivity and impartiality may be lessened or lost; (3) if a juror submits a question in open court, the other jurors are informed as to what the questioning juror is thinking, which may begin the deliberation process before the evidence is concluded and before final instructions from the court; (4) if the juror is permitted to question the witness directly, the interaction may create tension or antagonism in the juror; and (5) the procedure may disrupt courtroom decorum.'[6]
Gilden, however, was the first Ohio appellate case to announce a new rule of law that allowing jurors to question witnesses was per se grounds for reversal of a conviction, based mostly on the law of Nebraska and Mississippi.[7] Most courts, including this district, have allowed judges to permit jurors to submit questions to witnesses, subject to an abuse of discretion, and have required a defendant to demonstrate prejudice before such a practice will result in reversal.[8] This court's position on this issue was established in State v. Sheppard,[9]
which states that, although it is not encouraged, `the right of a juror to question a witness during trial is within the sound discretion of the court.'[10]"[11]
 {¶ 14} The Ohio Supreme Court has recently decided the question of whether jurors may submit questions to witnesses testifying at trial, in any circumstances, and held, "[t]he practice of allowing jurors to question witnesses is within the discretion of the trial court."[12] We have consistently ruled that a defendant must demonstrate prejudice from a judge's decision to allow jurors to question witnesses in order to demonstrate an abuse of discretion in allowing it, and, in State v.Fisher, supra, the Ohio Supreme Court also reached that conclusion.[13]
 {¶ 15} In guiding trial judges as to the proper way to permit juror questioning of witnesses, the Fisher court observed:
"To minimize the danger of prejudice, however, trial courts that permitjuror questioning should (1) require jurors to submit their questions tothe court in writing, (2) ensure that jurors do not display or discuss aquestion with other jurors until the court reads the question to thewitness, (3) provide counsel an opportunity to object to each question atsidebar or outside the presence of the jury, (4) instruct jurors thatthey should not draw adverse inferences from the court's refusal to allowcertain questions, and (5) allow counsel to ask followup questions of thewitnesses."[14]
 {¶ 16} Buehner has not identified as prejudicial any specific question asked by a juror. In this case, as in State v. Richards, the judge allowed the jurors to submit written questions, she conferred with all parties at sidebar to ensure the evidentiary propriety of the questions and then gave each a chance to object to each one being asked. Apart from a blanket objection to the practice of permitting the jurors to submit questions, which we find to be permissible in the format used by the judge, Buehner failed to object, with stated reasons, to any jury question asked of a witness. We see no abuse of discretion nor resultant prejudice. This assignment of error is not well taken.
 II. JURY QUESTIONS DURING DELIBERATION. {¶ 17} Buehner claims that during deliberations the jury submitted four questions and the judge failed to preserve answers she gave in response. He also contends that the failure to place those answers on the record deprived his lawyer of the opportunity to object to any answer she gave. These claims lack merit.
 {¶ 18} Contrary to Buehner's assertion on appeal, the questions submitted by the jury foreperson during deliberations and the written answers supplied by the judge are contained in the record. An appellant's brief must contain argument and law, "with citations to the authorities, statutes, and parts of the record on which appellant relies."[15] Buehner has the responsibility to identify what may have been objectionable about the answers the judge gave. If in presenting an assignment of error for review he "fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately in the brief," this court may disregard the assignment of error.[16] It is not the obligation of an appellate court to search for authority to support an error alleged in an appellant's argument.[17]
 {¶ 19} Additionally, after the verdicts, the judge polled the jury and the following exchange took place:
"[Asst. Prosecutor:] Your Honor, if we could put the juror notes on therecord.
 "THE COURT: I'll make sure that all the juror's questions to me, Ibelieve there were three questions that I discussed with all of you.
"[Defense Counsel]: More than that.
"THE COURT: They'll be made part of the record.
"[Asst. Prosecutor:] At all times, all attorneys were present before youresponded.
"THE COURT: That's true.
"[Defense Counsel]: Actually, there was — there were four, the longone. Then they came back right after asking for statements. Then we hadthe two today, which was the one relative to the dictionary business andthe fourth one would have been relative to the prior cal.; there werefour. I have four separate questions.
"THE COURT: I don't remember the prior cal.-
"[Asst. Prosecutor:] They asked for how much time.
"THE COURT: You're right. I'll make sure they're attached to therecord."[18]
 {¶ 20} Far from indicating that Buehner was denied the opportunity to object to the judge's answers to the jury's questions, this exchange confirms that the answers were given after all parties had been consulted. Additionally, had Buehner wished to object to any answer to a jury question, he could have included it in the record at this time, and did not. Failure to object to an instruction waives all but plain error.[19]
 {¶ 21} Crim.R. 52(B) states that, "Plain error or defect affecting substantial rights may be noticed although they were not brought to the attention of the court." Error is not plain error unless the outcome of an accused's trial clearly would have been otherwise, but for the error.[20] The standard for plain error is whether substantial rights of the accused are so adversely affected as to undermine the fairness of the guilt determining process.[21] Notice of plain error is to be taken with the utmost of caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.[22]
 {¶ 22} One of the jury's questions was a request to see the written statements that Edwards and Price gave to police. The judge denied the request and instructed the jury to use their collective memory of the testimony and evidence to reach a verdict. In another, the jury's foreperson indicated that the jury was deadlocked, with two dissenting jurors holding fast to their positions; the judge merely told the jury to keep deliberating. When the jury inquired as to how much time must elapse between a crime and a defendant's alleged prior calculation and design, presumably in deciding whether Buehner had killed with prior calculation and design, the judge merely referred the jury to the instruction on "prior calculation and design" she had already given. Finally, the judge refused the jury's request for a dictionary, replying that the jurors should rely on the instructions she had given earlier.
 {¶ 23} When a jury requests clarification of instructions after it has retired to deliberate, a judge has discretion to decide how to address such requests.[23] We see no abuse of discretion here, as the judge actually did not even provide clarification, but referred the jury to the prior instructions. Buehner has assigned no error to the judge's initial instructions to the jury, and has demonstrated no prejudice flowing therefrom. This assignment of error is not well taken.
 III. INSUFFICIENT EVIDENCE {¶ 24} Buehner argues that his conviction for attempted murder was based on insufficient evidence, and we agree. Whether the evidence is legally sufficient to sustain a verdict is a question of law.[24]
According to Crim.R. 29,
"The court on motion of the defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction on such offense or offenses. * * *"
 {¶ 25} Whether phrased in terms of a Crim.R. 29 motion, or in terms of a sufficiency of the evidence argument, the relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[25]
 {¶ 26} According to R.C. 2903.02(A), the statute defining the offense of murder, "[n]o person shall purposely cause the death of another." According to R.C. 2923.02(A), "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct which, if successful, would constitute or result in the offense." Accordingly, in order to properly obtain a conviction for attempted murder, the State was obligated to show, beyond a reasonable doubt, that Buehner purposely or knowingly engaged in conduct which, if successful, would have resulted in the murder of Lawone Edwards.
 {¶ 27} Edwards testified that Buehner shot Saunders once or twice and then began to point his gun at him, prompting him to turn and run. While he testified that he heard two or three more shots as he ran, he did not testify to any perception that Buehner was shooting at him, although he did claim that Price and Buehner briefly attempted to locate him after he ran. Price testified that Buehner fired about four shots in rapid succession and nothing about his testimony can be construed to indicate that shots were fired at anyone other than Saunders. Harris testified that about a minute after Edwards and Saunders jumped in the bed of the pickup truck and it stopped about half-way up the street, he heard three or four gunshots, he looked up and saw two silhouettes run away from the truck. He stated that the unidentified black man approached someone lying on the lawn and bent over and riffled through his pockets. After the truck drove away, Harris said he walked up and discovered Saunders' body.
 {¶ 28} The above testimony is the only evidence of what transpired in the early morning of May 24, 2001. Viewed in a light most favorable to the State, we can see that Buehner displayed his willingness to shoot people because he shot Saunders. We know that after he shot Saunders, he pointed his gun at Edwards, or at least moved as though he intended to do so. What is not established at all, however, is that the shots that Edwards heard as he ran were fired in his direction. The only bullet recovered from the scene of the shooting, other than the one eventually recovered from Saunders body after his death, was found lodged in the porch of the house at 9520 Marah Avenue — a location which, from the description of events, only presents the inference that the bullet was fired in the direction of Saunders, not Edwards.[26]
 {¶ 29} Because the State presented no evidence from which the jury could infer that any shot Buehner fired was intended for Edwards, the State failed in its burden to show that Buehner engaged in conduct which would have resulted, if successful, in Edwards' death. This assignment of error has merit. Buehner's conviction for attempted murder is reversed and remanded to the trial court to enter a journal entry consistent with this opinion. The judgment is affirmed in all other respects.
Judgment affirmed in part, reversed in part.
COLLEEN CONWAY COONEY, J., CONCURS
MICHAEL J. CORRIGAN, P.J., CONCURS IN JUDGMENT ONLY IN PART AND DISSENTS IN PART (SEE SEPARATE CONCURRING/DISSENTING OPINION.
[1] Price testified that Buehner was in the process of concluding the drug transaction with an unidentified black male when Saunders approached the truck from the vicinity of the 9520 Marah house which was to his right.
[2] "Wet" cigarettes are typically tobacco or marijuana cigarettes that are dipped in liquid PCP or formaldehyde.
[3] One count alleged prior calculation and design, and the second alleged aggravated murder while committing or attempting to commit aggravated robbery.
[4] Cuyahoga App. No. 79350, 2002-Ohio-6623.
[5] (2001), 144 Ohio App.3d 69.
[6] Id. at 72.
[7] See Id.
[8] State v. Belfoure, Cuyahoga App. No. 80159, 2002-Ohio-2933; Statev. Smith, Cuyahoga App. No. 79527, 2002-Ohio-2145; State v. Wayt (1992),83 Ohio App.3d 848, 857-858; State v. Sheppard (1955), 100 Ohio App. 345,390, affirmed on other grounds (1956), 165 Ohio St. 293; State v. Cobb, Seneca App. No. 13-2000-07, 2000-Ohio-1712; Logan v. Quillen, (Oct. 27, 1995), Hocking App. No. 94CA26; State v. Mascarella, (June 30, 1995), Tuscarawas App. No. 93 AP 100075; State v. Sexton, (Nov. 24, 1982), Clark App. No. 1689; State v. Ernst, (Oct. 29, 1982), Sandusky App. No. S-82-7.
[9] (1955), 100 Ohio App. 345.
[10] Id. at syllabus, paragraph 5.
[11] State v. Richards, supra, paragraphs 39-41.
[12] State v. Fisher, 99 Ohio St.3d 127, 2003-Ohio-2761, at the syllabus.
[13] "[T]he decision to allow jurors to question witnesses is a matter within the discretion of the trial court and should not be disturbed on appeal absent an abuse of that discretion." Fisher, at paragraph 31.
[14] Id. at paragraph 29.
[15] App.R. 16(A)(7).
[16] App.R. 12(A)(2).
[17] See Kremer v. Cox (1996), 114 Ohio App.3d 41, 60.
[18] Transcript, p. 824-825.
[19] State v. Chinn, 85 Ohio St.3d 548, 554, 1999-Ohio-288.
[20] State v. Nicholas (1993), 66 Ohio St.3d 431, 436.
[21] State v. Swanson (1984), 16 Ohio App.3d 375, 377.
[22] State v. Pumpelly (1991), 77 Ohio App.3d 470, 475.
[23] State v. Lindsey, 87 Ohio St.3d 479, 488, 2000-Ohio-465.
[24] State v. Robinson (1955), 162 Ohio St. 486.
[25] See State v. Thompkins, 78 Ohio St.3d 380, 1997-Ohio-52; State v.Jenks (1991), 61 Ohio St.3d 259.
[26] While Saunders turned and ran southwesterly towards 9520 Marah Ave., it was undisputed that Edwards ran away from the truck and awayfrom that house in a southeasterly direction.